# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2626

_____

Robert Rakes, individually, and on     *
behard of all others similarly situated;    *
Robert Hollander, individually, and on   *
behalf of all others similarly situated,    *

                                  *   Appeal from the United States
          Appellants,         *   District Court for the
                                    *   Northern District of Iowa.
      v.                        *
                                    *
Life Investors Insurance Company     *
of America,                            *
                                    *
          Appellee.          *

_____

Submitted: March 12, 2009
Filed: September 18, 2009

_____

Before WOLLMAN, RILEY, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Robert Rakes and Robert Hollander (plaintiffs), the named plaintiffs in a purported class action lawsuit against Life Investors Insurance Company of America (Life Investors), appeal from the district court's[1] order denying their motion for a continuance under Federal Rule of Civil Procedure 56(f) and granting summary

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

judgment in favor of Life Investors on their claims of fraud and tortious breach of the implied covenant of good faith and fair dealing (bad faith). We affirm.

## I. Background

Rakes and Hollander purchased long term care (LTC) insurance from Life Investors. Their policies were guaranteed renewable for life, and Life Investors reserved the right to change their premiums based on premium class. After their premiums were raised, Rakes and Hollander filed a class action complaint, alleging that Life Investors used inflated lapse rates[2] to purposefully underprice its LTC insurance products and gain market share.

### A. Overview of LTC Insurance

LTC insurance provides payment towards the cost of services like nursing home care, assisted living care, and home care. To receive benefits, the policyholder must meet a benefit trigger, such as requiring assistance in two activities of daily living (e.g., bathing, eating, dressing). LTC insurance policies are usually purchased long before the policyholder will require services, when the policyholder is younger and the insurance premiums are lower.

LTC insurance is a relatively new product. It has been available since the mid-1970s and experienced substantial growth in the 1990s. In 2003, the Kaiser Foundation published the report, "Regulation of Private Long-Term Care Insurance:

---

[2]Lapse is the cancellation of coverage due to death or nonpayment of premiums. Lapse rate refers to the percentage of policyholders whose policies lapse before long term care services are required. Persistency rate is the percentage of policyholders who renew their policies.

Implementation Experience and Key Issues."[3]   The report described the pricing of LTC policies as "subject to considerable uncertainty," and it listed a number of variables—including lapse rates—that affect the reliability of premium calculations. Appellants' Appendix (App.) 296. "As a result [of the variables], two insurers pricing the same policy can come up with very different rates.  One using very optimistic assumptions might charge half as much as a more conservative insurer, with the risk of needing rate increases later on." Id.

States regulate LTC insurance, and most states do not allow insurers to raise a policyholder's premium on an individual basis.  State regulators might approve a rate increase applicable to an entire class of policyholders, however, if an insurer is able to show that more revenue is needed to cover current or future costs.  When LTC insurance was first introduced, state regulators tended to treat it like health insurance and focused on the affordability of the premiums.  According to the Kaiser Report, "[t]here was no examination to assure that premiums were not too low; on the contrary, insurers were discouraged from including any margin for error." Id.  The report further remarked that "[s]ome less scrupulous insurers" deliberately set "unrealistically low initial premiums to gain market share, knowing that they might have to raise rates later on." Id. Rakes and Hollander argue that Life Investors falls into this "less scrupulous" category.

LTC insurance rate hikes have sparked class action litigation across the country, with mixed results. E.g., Alvarez v. Ins. Co. of N. Am., No. 06-4326, 2006 WL 3702641 (E.D. Pa. Dec. 12, 2006) (unpublished) (granting defendant life insurance company's motion to dismiss for failure to state a claim on which relief can be granted), aff'd 313 F. App'x 465 (3d Cir. 2008) (unpublished);  Hanson v. Acceleration Life Ins. Co., No. CIV A3-97-152, 1999 WL 33283345 (D.N.D. Mar. 16,

---

[3]The plaintiffs have relied on the Kaiser Foundation report and included it in their appendix.   App. 286-346.   We have used information from the report to draft this overview.

1999) (unpublished) (certifying class action and denying defendant insurance company's motion for judgment on the pleadings), 2000 WL 33340298 (D.N.D. June 21, 2000) (unpublished) (memorandum and final order on approval of settlement); Rose v. United Equitable Ins. Co., 632 N.W.2d 429 (N.D. 2001) (reversing grant of defendant insurance company's motion for summary judgment), 651 N.W.2d 683 (N.D. 2002) (affirming class certification). The plaintiff in Hanson v. Acceleration Life Insurance Co. experienced a rate increase of more than four hundred percent over nine years. He testified in a hearing before the Senate Special Committee on Aging, and cases like his caused the National Association of Insurance Commissioners to change their model regulations.

## B.  Factual Background

### 1.  Life Investors

Janet Soppe, Life Investors's LTC division president throughout the 1990s, testified that Life Investors intended that the policies at issue would be level premium policies; that is, the premium would remain the same throughout the life of the policy. Robert Darnell, the actuary who priced the policies that Rakes and Hollander purchased, testified repeatedly that there was no intention to raise premiums and that "there was never discussion of any plan to increase the Life Investors long-term care insurance premium rates." Supplemental Appendix (S.A.) 721. Darnell was confident that all of Life Investors's policies were appropriately priced, and when asked whether Life Investors planned to require policyholders to bear some of the risk of inadequate pricing due to higher than expected claims costs, Darnell responded:

> There was no plan for it because the plan was based on the claims cost that we priced in there. We expected our claims cost to be adequate.
> . . .
> Now then if they were not adequate then there's different ways of looking at it. And if there would have been a rate increase then—then

-4-

the rate increase going forward would take care of it. But there was no plan at all for ever having a rate increase throughout the 90's.

S.A. 717.

The policies at issue were priced in the 1990s with the actuarial assumption that the projected lapse rate would be a certain percentage in the first policy year and a different, lower percentage thereafter. The actual lapse rate, however, was lower than expected. Soppe explained that "in the early nineties, mid nineties, there was no discussion in the industry about the concern about lapse rates getting too low" and that lapse rates did not become an issue until the late 1990s or early 2000s. S.A. 2599, 2602. Ross Bagshaw, the president of the LTC division, joined Life Investors in 2000. He analyzed data and reports related to the insurance products at issue, determining that the "lapse assumptions in the pricing and in the reserving were too high." App. 570. Under Bagshaw's direction, the company instituted rate hikes and informed its policyholders that further premium increases were likely.

## 2. The Named Plaintiffs

Rakes purchased an LTC insurance policy from Life Investors in 1994. Before purchasing the policy, an insurance agent met with Rakes at his home in McLean, Virginia, two or three times. The first page of his policy stated:

> **THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE**
> **WE HAVE A LIMITED RIGHT TO CHANGE PREMIUMS**
> Your timely payment of premiums is all that is needed to keep this Policy in force until benefits have been exhausted. We cannot cancel or refuse to renew this Policy. Your premiums will not increase due to a change in Your age or health. We can, however, change Your premiums based on Your premium class.

Compl. Ex. A. From 1994 until his policy anniversary in 2004, Rakes paid an annual premium of $1006.20.

In 2004, Rakes's annual premium increased to $1408.68. In the letter notifying Rakes of the rate hike, Life Investors stated that it was necessary to raise premiums because "sometimes claims significantly exceed anticipated levels." Compl. Ex. C. The notification included a Frequently Asked Questions (FAQ) document, wherein Life Investors stated that the policyholder should expect another increase in two years and that it had requested approval for the increase from the state department of insurance. Moreover, Life Investors disclosed that it might apply for other premium increases in the future.

Rakes contacted the Virginia Bureau of Insurance, seeking information and expressing concern about the rate increase. The Bureau replied that it had reviewed and approved the rate increase, that Life Investors had closed the individual LTC insurance block, and that premiums would likely increase due to the declining numbers of policyholders and an increasing numbers of claims. Rakes decided to keep his LTC insurance and maintain the original scope of coverage. When Life Investors implemented another rate hike in May 2007 to $1901.64 per year, however, Rakes opted to convert the policy to a contingent nonforfeiture benefit.[4]

Rakes did not believe that his premium would increase, and he did not read closely the documents he received from Life Investors. Rakes testified that his insurance agent told him that "the only way my rates could go up is if my class changed." S.A. 657.

---

[4]The contingent nonforfeiture benefit provided a maximum benefit equal to the total of the premiums that the insured had paid under his LTC insurance policy.

Hollander purchased an LTC insurance policy from Life Investors in June 2001 through the National Education Association, an organization of which he is a member. An insurance agent met with Hollander in his home in Creve Couer, Missouri, to discuss the policy. Hollander's insurance certificate stated:

**INSURANCE CERTIFICATE**
**GUARANTEED CONVERTIBLE TO GUARANTEED RENEWABLE**
**PREMIUMS SUBJECT TO CHANGE**

Compl. Ex. B. His certificate also stated that Life Investors had a right to change premiums: "Premiums will not increase due to a change in Your age or health. We can, however, change Your premiums based on Your premium class." Id. From 2001 until 2005, Hollander paid an annual premium of $1368 for his LTC insurance.

In June 2005, Hollander received a letter from Life Investors, similar to the letter Rakes received, informing him of a rate hike and warning him that a future rate increase was probable. Hollander complained to the Missouri Department of Insurance, which contacted Life Investors to investigate the complaint. Life Investors responded that the premium rate increase had been approved by the Department. In August 2005, Hollander's annual premium increased to $1846.80. Hollander has maintained his policy and its original scope of coverage.

Hollander testified that he knew that his LTC insurance premium could change.

Q:     At the time that you purchased your policy in June of 2001, your policy from Life Investors, did you have an understanding as to whether Life Investors could increase the premiums?

A.     There was a reference to it. And I'm sure I asked [the insurance agent] about it. The reference said about your premium class. There was no other—there was no explanation, . . . I don't think I had an idea at the time as to why it would occur.

S.A. 509. Hollander's insurance agent also testified that he advised Hollander that LTC premiums could increase over time, referring to part of a brochure that explains that "premiums would not be—or could not be increased due to age or to change in health. They could only be increased within their class." S.A. 672.

## C. Procedural Background

Rakes and Hollander filed this class action lawsuit against Life Investors in July 2006, alleging that Life Investors had used inflated lapse rates to purposefully underprice LTC insurance products with the intent to raise premiums in the future. Although the policies and marketing material disclosed that the insureds' rates could increase, Rakes and Hollander alleged that Life Investors had planned to increase premiums from the outset, yet failed to disclose the plan at the time the insureds bought their policies or upon renewal. The policies' "guaranteed renewable" language was thus untrue and misleading because the rate hikes caused the policies to become unaffordable. The complaint asserted that "[b]y selling the LTC policies . . . as guaranteed renewable policies, Life Investors affirmatively represented that the LTC policies would also be affordable for life." Compl. ¶ 28.

Rakes and Hollander identified a number of fraudulent omissions, centering on the defective nature of the policies and Life Investors's plan to pass the risk of loss to its insureds by instituting rate hikes. The plaintiffs pleaded that Life Investors further misled them in the documents accompanying the premium increase notification, using false reasons to justify the rate increases. Specifically, they identified the following allegedly false statements from the materials accompanying the notification of the rate hike:

    a. "We make every effort to provide quality coverage at reasonable and affordable premium rates."

b. "However, sometimes claims significantly exceed anticipated levels."

 . . .

c. "The company has the right to adjust your premiums in accordance with the terms of the policy."

d. "When long term care insurance policies like yours were originally filed and approved there was limited actuarial and claims experience data available that could provide an accurate forecast of how the actual experience would develop."

Compl. ¶ 50 (emphasis omitted).

The complaint alleged four counts: actual fraud, constructive fraud, tortious breach of the implied covenant of good faith and fair dealing (bad faith), and punitive damages. Rakes and Hollander sought to represent all individuals who bought certain LTC insurance policies from Life Investors "and whose premiums on those policies were increased at any time after 2000." Compl. ¶ 63.

Life Investors moved to dismiss, and the district court granted the motion as to the punitive damages count. The district court tentatively determined that Iowa had the most significant relationship to the case because the fraudulent scheme likely originated from or was ratified in Iowa, where Life Investors is incorporated and maintains its home office, rather than in Missouri or Virginia, where Rakes and Hollander purchased their policies. Accordingly, it applied Iowa law to the motion to dismiss, noting that it would revisit the choice of law question at class certification and after the parties completed discovery related to choice of law.

The parties submitted a proposed scheduling order and discovery plan, which bifurcated discovery. The first phase encompassed class certification and fact discovery as to the named plaintiffs; merits discovery was allowed to the extent the discovery sought pertained to both class certification and the underlying claims. The

second phase was scheduled to begin following the court's ruling on class certification and included any remaining discovery.  The magistrate judge[5] adopted the parties' proposed scheduling order.[6]

The parties engaged in extensive discovery during phase one, and the magistrate judge carefully considered each discovery dispute.  Document production was voluminous, and Rakes and Hollander requested, among other things, data relied upon by the actuaries in pricing the policies and information regarding the policies' anticipated and actual lapse rates.  After Rakes and Hollander moved to compel the production of those documents, Life Investors stated that it had produced all documents regarding the pricing of the plaintiffs' policies.  The magistrate judge ordered Life Investors to produce the requested information, to the extent it had not already done so, and to identify documents pertaining to "the original expected termination and/or lapse rates and expected loss ratios" for the policies at issue.  Rakes v. Life Investors Ins. Co. of Am., No. C06-0099, 2008 WL 429060, at *3 (N.D. Iowa Feb. 14, 2008) (unpublished).  In response to an interrogatory, Life Investors stated that it also had produced information related to initial rate filings, rate increase filings, and related correspondence with state regulators for each of its LTC insurance policies in Virginia, Missouri, and Iowa.  Rakes and Hollander deposed a number of people, including the actuaries who priced their policies, the executives and actuaries who pursued the policy rate increases, and Life Investors's Federal Rule of Civil Procedure 30(b)(6) corporate designee.

---

[5]The Honorable Jon S. Scoles, United States Magistrate Judge for the Northern District of Iowa, who took a liberal view of the phased discovery, ordering the production of documents and extending the discovery schedule.

[6]The parties filed their briefs and appendices under seal pursuant to their broad confidentiality stipulation and order.  We conclude that it is unnecessary to seal this opinion, however, as it contains no information that we deem confidential.

Before the motion for class certification was due, Life Investors moved for summary judgment, arguing that the law from the plaintiffs' home states should apply, that the fraud claims were barred because Life Investors disclosed potential rate increases, and that the complaint failed to state a claim for the tort of bad faith. Rakes and Hollander moved for a continuance and asked that the summary judgment motion be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 56(f), which allows the district court to grant appropriate relief to a party that cannot present facts essential to justify its opposition to a summary judgment motion. Rakes and Hollander also substantively opposed Life Investors's motion.

The district court denied the plaintiffs' Rule 56(f) motion, concluding that further discovery into Life Investors's disclosures was unnecessary, and granted the motion for summary judgment, ruling that Life Investors's "numerous disclosures of its right to raise premiums negates any alleged misrepresentation or Plaintiffs' reasonable reliance on a belief their rates would not increase." Rakes v. Life Investors Ins. Co. of Am., 622 F. Supp. 2d 755, 767 (N.D. Iowa 2008). Because Iowa, Missouri, and Virginia law require that a plaintiff's reliance on the alleged fraudulent representations or omissions be reasonable, the district court found no conflict of law and determined that summary judgment was appropriate under the law of each of the three states. The district court also dismissed the plaintiffs' claim of "Tortious Breach of Implied Covenant of Good Faith and Fair Dealing (Bad Faith)" for failure to plead the tort of bad faith. Rakes and Hollander did not resist summary judgment based on their constructive fraud claim and have not appealed its dismissal.

## II. Analysis

We review *de novo* the district court's grant of summary judgment, viewing the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. St. Paul Fire and Marine Ins. Co. v. Compaq Computer Corp., 457 F.3d 766, 769 (8th Cir. 2006). Summary judgment is appropriate

-11-

if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). We review for abuse of discretion the district court's denial of a Rule 56(f) continuance, upholding the decision if the nonmoving party was not deprived of a fair chance to respond to the summary judgment motion. Nord v. Kelly, 520 F.3d 848, 852 (8th Cir. 2008); Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1054 (8th Cir. 2007).

## A. Summary Judgment

Rakes and Hollander argue that there exist genuine issues of material fact as to whether they reasonably relied on Life Investors's statements that its policies were "guaranteed renewable for life" and that Life Investors had only a limited right to change premiums. They contend that their knowledge that Life Investors might raise premiums does not preclude their fraud claim because (1) Life Investors planned to raise premium rates when it sold the LTC insurance policies, yet it did not disclose the planned rate hike; (2) at some point, Life Investors realized that its actuarial assumptions were wrong and thus rate increases were inevitable, yet it did not disclose that information, causing the insureds to unwittingly renew their policies; and (3) Life Investors lied about its reasons for instituting the rate hikes when it stated that the claims significantly exceeded anticipated levels and that limited actuarial and claims experience data failed to provide an accurate forecast. Rakes and Hollander further argue that their claim for tortious breach of the implied covenant of good faith and fair dealing (bad faith) should be reinstated.

## 1. Actual Fraud

We agree with the district court that summary judgment was appropriate under Iowa, Virginia, and Missouri state law. Because no conflict of law exists, we need not determine which state law applies to the plaintiffs' fraud claim. Prudential Ins. Co. of Am. v. Kamrath, 475 F.3d 920, 924 (8th Cir. 2007).

To establish a claim for actual fraud, the plaintiffs must prove a false representation of a material fact, made knowingly and intentionally, with the intent to mislead, justifiable reliance, and damages. Magnusson Agency v. Pub. Entity Nat. Co.-Midwest, 560 N.W.2d 20, 27-28 (Iowa 1997); Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994); Emerick v. Mu. Ben. Life Ins. Co., 756 S.W.2d 513, 519 (Mo. 1988). A misrepresentation, which serves as the basis for a fraud claim, can be based upon a failure to disclose information in certain circumstances. See, e.g., Nelson v. DeKalb Swine Breeders, Inc., 952 F. Supp. 622, 628 (N.D. Iowa 1996) (citing Cornell v. Wunschel, 408 N.W.2d 369, 374 (Iowa 1987)); Andres v. Albano, 853 S.W.2d 936, 943 (Mo. 1993); Clay v. Butler, 132 Va. 464, 474 (Va. 1922).

Plaintiffs have not shown that their LTC insurance policies contained a fraudulent representation. The plaintiffs were not guaranteed a level premium for life; they were guaranteed the right to renew their LTC insurance policies. Accordingly, Life Investors could not cancel or refuse to renew their policies for any reason other than their nonpayment of premiums. Life Investors disclosed its right to change premium rates on the first page of its policies, in boldface, capital letters. This right was limited, in that Life Investors could not change premiums on an individual basis. Moreover, although Rakes and Hollander believed that their premium rates would not increase, both testified that they were aware that the rates could increase. Thus, there is no genuine issue of material fact as to whether the policies' guaranteed renewable language constituted a fraudulent representation.

Despite the substantial document production, written discovery, and depositions in this case, the plaintiffs have failed to support their assertion that Life Investors fraudulently omitted that it had initially underpriced its LTC insurance policies, intending to seek a series of premium increases and to shift the risk of loss to its policyholders. Plaintiffs have directed us to statements, reports, studies, similar cases, and their expert's affidavit to show that some companies in the LTC insurance industry deceptively underpriced policies, but they have failed to create a genuine issue of material fact that Life Investors did so in this case. Plaintiffs failed to support the following sweeping allegations with record citations:

> LI's internal documents establish that it knew because it was using inappropriately high lapse rates when initially pricing the policies, persistency would cause losses within the blocks of insurance. LI intended, but did not disclose, that it would pass its persistency risk to its insureds in the form of rate increases.

Appellants' Br. at 20.

Where the plaintiffs have provided citations, the documents and testimony support Life Investors's position that it priced the policies using appropriate lapse rates. For example, the plaintiffs have cited a letter dated April 12, 1993, from actuary Darnell to the Florida Department of Insurance. The department had disapproved Life Investors's filing because the regulators believed that Life Investors would not meet its filed loss ratio because its assumed lapse rates were too low. In support of Life Investors's position that its lapse rate assumptions were appropriate, Darnell disclosed that the actual lapse rate for the LTC insurance product at issue was the same as its assumed lapse rate in the first year and the actual lapse rate was slightly lower than the assumed lapse rate in the second year. Darnell wrote, "I realize that these persistency rates are somewhat above the industry average. At Life Investors, we work hard to keep to keep our policies in force. . . . Then, as now, high lapse rates

-14-

were unacceptable to Life Investors and they should be unacceptable to our industry." App. 718

Taken in the light most favorable to the plaintiffs, the other evidence cited shows that Life Investors realized in the early 2000s that its lapse rate assumptions were too high. Plaintiffs cite a 2000 LTC status report, board meeting minutes from 2000, and LTC division president Bagshaw's testimony that, after he joined Life Investors in 2000, the company discovered that its lapse rate assumptions were higher than the lapse rate it was experiencing. Former LTC division president Soppe also testified that she became aware around that time period that lapse rates were an issue. Plaintiffs contend that Life Investors had a duty to disclose that its lapse rate assumptions were wrong and that rate increases were thus inevitable, but they have cited no law that requires an insurance company to disclose its actuarial assumptions to its policyholders, and the record reflects that Life Investors did not consider rate increases until 2001 or 2002.

The alleged misrepresentations in the documents accompanying the notification of the rate hike are not actionable. Life Investors stated that it implemented rate increases because "sometimes claims significantly exceed anticipated levels." Compl. Ex. C. Viewing the evidence in the light most favorable to the plaintiffs, Life Investors misrepresented that the rate hikes were due to increased claims, but the plaintiffs have failed to explain how this misrepresentation was material or how they relied on it. Moreover, Life Investors disclosed that future rate increases were likely, a representation that would be material to the insured's decision whether to renew his policy. The FAQ accompanying Rakes's notification stated:

**You have told me that you are going to increase my premiums. Can I expect another increase in the future?**

Yes. When we notified the Department of Insurance of the need for this premium increase, we requested one additional increase to be effective

-15-

two years from now. . . . Further, it is our hope that it will not be necessary to consider any additional increases beyond these two, but it is possible.

Id.  In response to the FAQ accompanying Hollander's notification, Life Investors stated, "It is probable that in the future you will receive additional premium increases."  Compl. Ex. D.

## B.  Bad Faith

We affirm the district court's dismissal of the plaintiffs' claim for tortious breach of the implied covenant of good faith and fair dealing (bad faith).  In the insurance context, the Iowa Supreme Court has held that "[t]he tort of bad faith arises in situations where the insurer has denied benefits or has refused to settle a third-party's claim against the insured within the policy limits."  Vos v. Farm Bureau Life Ins. Co., 667 N.W.2d 36, 51 (Iowa 2003).  Plaintiffs have not made a claim for benefits under their policies, and we decline the invitation to extend Iowa law to fit their allegations.[7]

## C.  Rule 56(f) Motion

We conclude that the district court did not abuse its discretion in denying plaintiffs' Rule 56(f) motion for a continuance.  Plaintiffs had a fair chance to oppose Life Investors's motion, and the discovery sought was not relevant to the district court's decision.

On appeal, the plaintiffs contend that they were denied access to merits discovery related to Life Investors's disclosures to policyholders and Life Investors's

---

[7]Plaintiffs have conceded that they have not pleaded a cause of action for bad faith under Virginia or Missouri law.

regulatory filings.  As stated above, the plaintiffs were entitled to fact discovery as to the named plaintiffs and merits discovery pertaining to both class certification and the underlying claims.  Presumably, then, Rakes and Hollander were entitled to discovery related to the disclosures Life Investors made to them, which they requested.  Although the plaintiffs had not deposed the executives who had knowledge related to the drafting of the policy language and the correspondence to policyholders, it is not clear whether plaintiffs noticed those depositions.  Moreover, we have concluded that the policy's "guaranteed renewable" language was not a misrepresentation and that the plaintiffs have failed to support their fraudulent omissions contention because they made no showing that Life Investors used a deceptively low lapse rate to underprice its LTC insurance products.  As for the contention that Rakes and Hollander were denied discovery of Life Investors regulatory filings, Life Investors produced documentation related to its initial rate filings and rate increase filings with state regulators for each of its LTC insurance policies in Virginia, Missouri, and Iowa.  Plaintiffs have not identified what they were missing or explained how they were prevented from opposing the motion for summary judgment without discovery related to Life Investors's filings in the forty-seven other states.

## Conclusion

In light of our holding, we need not discuss Life Investors's arguments that plaintiffs' action is barred by the filed rate doctrine, that Rakes's claims are barred by the statute of limitations, and that Hollander's claims are barred by the Employee Retirement Income Security Act.

The judgment is affirmed.

_____