# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1351
_____

Dennis G. Collins; Suzanne Collins; David Butler; Lucia Bott, and all others
similarly situated

*Plaintiffs - Appellants*

v.

Metropolitan Life Insurance Company

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: January 10, 2024
Filed: September 20, 2024
_____

Before LOKEN, KELLY, and STRAS, Circuit Judges.
_____

LOKEN, Circuit Judge.

In 2007, Dennis Collins, Suzanne Collins, David Butler, and Lucia Bott (collectively, "Plaintiffs") each purchased a long-term care insurance policy from Metropolitan Life Insurance Company ("MetLife"). Plaintiffs are residents of St. Louis. At the time of purchase Bott was an Illinois resident; her policy was issued on an Illinois form. The other Plaintiffs' policies were issued on Missouri forms.

With each policy Plaintiffs paid additional premiums to purchase an Inflation Protection Rider that more than doubled the total cost of the policy. The policies described the most relevant terms of the Rider as follows (alterations in the original):

> Your benefit amounts will automatically increase each year with no corresponding increase in premium. The amounts of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior **Policy Year**.

> \* \* \* \* \*

> **Your premium is not expected to increase as a result of the benefit amount increases provided by this Rider. However, We reserve the right to adjust premiums on a class basis.**

In 2015, 2018, and 2019, MetLife informed Plaintiffs of substantial annual premium increases. Plaintiffs filed this putative class action on February 1, 2022, asserting claims of fraud, fraudulent concealment, violations of state consumer protection statutes, and breach of the implied covenant of good faith and fair dealing under Illinois and Missouri law.[1] The district court[2] granted MetLife's motion to dismiss, concluding that the filed rate doctrine under Missouri and Illinois law bars Plaintiffs' claims, and in the alternative that Plaintiffs bringing claims under Missouri law failed to exhaust administrative remedies. Plaintiffs appeal, arguing (1) the filed

_____

[1]In a diversity suit, we apply the choice-of-law rules of the forum State but need not conduct a choice-of-law analysis unless an actual conflict exists. Prudential Ins. Co. of Am. v. Kamrath, 475 F.3d 920, 924 (8th Cir. 2007). Here, both parties agree that Missouri law should apply to all Plaintiffs other than Bott, and that a choice-of-law analysis is unnecessary for Bott's claims because Illinois and Missouri law produce the same outcome. We conclude that all of Plaintiffs' claims fail under Missouri and Illinois law.

[2]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

rate doctrine does not bar their claims; (2) they were not required to exhaust administrative remedies under Missouri law before bringing suit; and (3) the complaint adequately alleged a claim for breach of the implied covenant.

Reviewing *de novo*, we affirm the dismissal because Plaintiffs' complaint fails to state a claim upon which relief can be granted. See UMB Bank, N.A. v. Guerin, 89 F.4th 1047, 1051 (8th Cir. 2024) (standard of review). "We . . . may affirm on any basis supported by the record." U.S. ex rel. Dunn v. N. Memorial Health Care, 739 F.3d 417, 419 (8th Cir. 2014) (quotation omitted). Therefore, we need not address whether the filed rate doctrine applies or whether failure to exhaust administrative remedies bars Plaintiffs' Missouri claims.

## I. Long-Term Care Insurance and Its Regulation

Long-term care insurance covers the cost of services such as nursing home care, assisted living care, and home care, up to a daily benefit amount for the defined benefit period. Long-term care insurance is a relatively new product. See Rakes v. Life Invs. Ins. Co. of Am., 582 F.3d 886, 888-89 (8th Cir. 2009). First available in the 1970s, it grew in popularity in the 1990s. Pricing an insurance product when the future costs the insurer will have to bear are unknown is particularly challenging in selling long-term care insurance because the "policies are usually purchased long before the policyholder will require services, when the policyholder is younger and the premiums are lower." Id. at 888. At the time of purchase, neither insured nor insurer knows what care services the insured will come to require, nor the cost of those services when they are needed.

When long-term care insurance was first introduced, many insurers did a poor job of estimating revenue requirements and consequently set premiums too low. Some were accused of deliberately underpricing initial premiums "with the expectation (or at least the knowledge or a high probability) that they would raise

premiums later on." If premiums are increased beyond what an aging insured can afford, the policy may lapse, with the insured's lengthy investment lost. Thus arose the demand for the Inflation Protection Rider. See generally Henry J. Kaiser Family Foundation, Regulation of Private Long-Term Care Insurance: Implementation Experience and Key Issues (2003).

Largely for historical reasons, insurance is regulated almost exclusively -- and extensively -- by the States. Since the late 1980s, the National Association of Insurance Commissioners (NAIC) has published a model long-term care insurance statute and model regulations, with regular updates. See NAIC, Long-Term Care Insurance Model Act (2017) ("Model Act"); NAIC, Long-Term Care Insurance Model Regulation (2017) ("Model Regulations"). Section 13A of the Model Regulations mandates the offering of an option to purchase inflation protection:

> No insurer may offer a long-term care insurance policy unless the insurer also offers to the policyholder in addition to any other inflation protection the option to purchase a policy that provides for benefit levels to increase with benefits or reasonable durations which are meaningful to account for reasonably anticipated increases in the costs of long-term care services covered by the policy.

Section 13F provides that "[a]n offer of inflation protection that provides for automatic benefit increases shall include an offer of a premium which the insurer expects to remain constant. The offer shall disclose in a conspicuous manner that the premium may change in the future unless the premium is guaranteed to remain constant." The regulations of the Missouri Department of Commerce and Insurance and the Illinois Department of Insurance have adopted these provisions of the Model Regulations verbatim. See 20 Mo. C.S.R. § 400-4.100(11)(A)(1), (11)(F); 50 Ill. Admin Code. § 2012.80(a)(1), (f). MetLife's above-quoted Inflation Protection Rider complied with these mandates.

MetLife is subject to insurance regulation in both Missouri and Illinois. Pursuant to the governing regulations, MetLife filed its long-term care policy forms and rate schedules with the Missouri Department of Commerce and Insurance and the Illinois Department of Insurance in 2004. Both states' regulators accepted the filings in 2005. MetLife filed long-term care policy rate increases with Missouri regulators in 2013, 2016, and 2019, and filed rate increases with Illinois regulators in 2012 and 2019. The increases were ultimately accepted and went into effect. In reviewing the 2016 increase, Missouri regulators objected to MetLife's rates, requesting that MetLife refile with smaller increases implemented over a longer time frame.

## II. This Dispute[3]

In notifying Plaintiffs it was increasing their long-term care premiums in 2015, 2018, and 2019, MetLife stated that it had initially priced the policies based on consideration of persistency rates, mortality rates, and morbidity rates but concluded that "a premium increase is necessary on certain long-term care insurance policies." Plaintiffs allege that the persistency rate, mortality rate, and morbidity rate did not change between the time they purchased the policies and the time when MetLife increased the premium rates. During that period, Plaintiffs allege, "[t]he only appreciable change . . . was that the future daily benefit amount for [Inflation Protection Rider] purchasers" had increased. "MetLife knew when it sold the products and each time it implemented premium increases, but did not tell insureds . . . that the projected daily benefit amounts, inflated to unreasonable levels, would be used to establish projected future losses and provided the primary basis and support for the rate increases" filed with Missouri and Illinois insurance regulators.

_____

[3]At the motion to dismiss stage, we assume that facts but not legal conclusions alleged in the Complaint are true. See UMB Bank, 89 F.4th at 1051. We therefore recount the facts as alleged in the Complaint.

Therefore, "Met Life's statement that '[y]our premium is not expected to increase as a result of the benefit amount increases provided by this Rider' was and is false."

Plaintiffs allege that, as a direct result of this misrepresentation, they "suffered damages in the form of separate premiums paid for the Rider." They seek, among other remedies, "[d]isgorgement of all premiums paid for the Rider by Plaintiffs and all others similarly situated."[4]

### III. The Fraud Claims

Plaintiffs' Complaint alleges fraud and fraudulent concealment. Under Missouri and Illinois law, proof of a fraud claim requires showing a false statement of material fact that the speaker knew or believed to be false, made to induce the other party to act in reliance on the truth of the statement, and damage to the other party resulting from reliance on the representation being true. See Emerick v. Mut. Ben. Life Ins. Co., 756 S.W.2d 513, 519 (Mo. banc 1988); Charles Hester Enters., Inc. v. Ill. Founders Ins. Co., 499 N.E.2d 1319, 1323 (Ill. 1986). Claims grounded in fraud must meet the heightened pleading requirement in Rule 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). When Rule 9(b) applies, "the complaint

---

[4]Because Plaintiffs enjoyed the inflation protection provided by this Rider for some 15 years, while having the good fortune not to need long-term care, this inequitable claim for disgorgement brings to mind the well-known expression, "There's no such thing as a free lunch." See Alliance Ins. Co. v. Colella, 995 F.2d 944, 946 (9th Cir. 1993) (Farris, J., dissenting). As Judge Farris explained, the aphorism derives from the practice of some nineteenth-century saloon and tavern owners to offer free food during the middle of the day to attract patrons. "Anyone who ate without buying a beverage soon discovered that 'free lunch' wasn't meant to be taken literally; he would be tossed out unceremoniously." (Citing Robert Hessen, The New Palgrave: A Dictionary of Economics (1987)).

must allege 'such matters as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009) (citation omitted).

Plaintiffs' Complaint alleges the following false statements in MetLife's Inflation Protection Rider: (1) "Your premium is not expected to increase as a result of the benefit amount increases provided by this Rider," and (2) increases in the benefit amount would have "no corresponding increase in premium." Plaintiffs allege MetLife knew but failed to disclose that the increased benefit amounts would create greater long-term care liability, which would require premium rate increases.

We fail to see a plausible claim of intentional fraud or fraudulent concealment. MetLife did not represent that it would never increase premiums. The Inflation Protection Rider stated in bold print that MetLife "**reserve[s] the right to adjust premiums on a class basis**." The challenge in pricing long-term care insurance is that premium rates are initially set years before benefits are likely to be paid out. The above-quoted Missouri and Illinois insurance regulations required MetLife to offer inflation protection that provides automatic benefit increases for "a premium which the insurer expects to remain constant." This required MetLife to charge initial premiums for the Inflation Protection Rider that would cover reasonably anticipated increases in the cost of providing covered long-term care services in the future. Predicting the future rates of inflation for different products and services is, as they say, an art and not a science. Insurance company actuaries may be highly sophisticated, but they are not clairvoyant. The NAIC long-term care regulations adopted in Missouri and Illinois recognize this reality: "The offer [of inflation protection] shall disclose in a conspicuous manner that the premium may change in the future unless the premium is guaranteed to remain constant."

Thus, the fact that MetLife ultimately did increase its premium rates does not establish the falsity of its "expectation" that its Inflation Protection Rider premiums would "remain constant." See Rakes, 582 F.3d at 894.[5] Nor do the facts alleged support the claim that MetLife falsely stated that the annual increases in benefit amounts would have "no corresponding increase in premium." Plaintiffs purchased long-term care insurance in February 2007 and filed this suit in February 2022. The Inflation Protection Rider increased the benefit amount five percent each year. The complaint alleges three premium increases during a fifteen-year period in which the benefit amount increased fifteen times. Standing alone, these three increases do not show that the "no corresponding increase" statement was materially false.[6]

For their claim of fraudulent concealment, Plaintiffs allege that "Met Life did not disclose to Plaintiffs or other purchasers that the increased daily benefit amounts promised by the Rider would be used by Met Life to seek and justify future premium increases," and that "[a]t the time it sold the Policies and the Rider, Met Life had a duty to disclose its knowledge and methodology to Plaintiffs and other purchasers." Under Missouri and Illinois law, fraudulent concealment has the same requirements as fraud, except that a party's silence is not fraudulent absent a legal duty to speak. See Hess v. Chase Manhattan Bank, USA, N.A., 220 S.W.3d 758, 765 (Mo. banc 2007); Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 593 (Ill. 1996).

We find no support for Plaintiffs' conclusory allegation that MetLife fraudulently concealed at the time it issued the policies that it would later raise

_____

[5]The Complaint does not sufficiently allege that MetLife intended that Plaintiffs rely on the absence of future premium rate increases, and that Plaintiffs reasonably relied on that expectation. The Rider expressly stated that premiums could increase.

[6]The Complaint fails to specify the amount of the premium rate increases, a fact relevant to determining whether they "correspond" to increased benefit amounts. In this respect, the Complaint fails to provide the level of specificity Rule 9(b) requires.

-8-

premiums. MetLife expressly reserved the right to increase premiums. Plaintiffs allege that MetLife "had a duty to disclose its knowledge and methodology to Plaintiffs . . . . because of the nature of the relationship between Met Life and Plaintiffs," including MetLife's "vastly superior knowledge about its methodology for determining future premium increases." No fiduciary relationship exists between an insurer and an insured. In the absence of a fiduciary relationship, "the defendant accused of fraudulent concealment must exercise overwhelming influence over the plaintiff . . . [and] asymmetric information alone does not show the degree of dominance needed to establish a special trust relationship." Toulon v. Cont'l Cas. Co., 877 F.3d 725, 738 (7th Cir. 2017) (applying Illinois law and affirming the dismissal of fraud claims based on a substantial increase of a long-term care insurance policy's premiums). Here, as in Toulon, Plaintiffs allege nothing more than information asymmetry. Moreover, the allegation of "vastly superior knowledge" fails Rule 9(b)'s particularity requirement. The published regulations governing long-term care insurance in Missouri and Illinois require an insurer to file a notice of a pending premium rate schedule increase that includes "[a]n actuarial memorandum justifying the rate schedule change request" that includes:

> C. Disclosure of the analysis performed to determine why a rate adjustment is necessary, which pricing assumptions were not realized and why, and what other actions taken by the company have been relied on by the actuary.

20 Mo. C.S.R. § 400-4.100(18)(A)(3)(C); 50 Ill. Admin Code. § 2012.112(b)(3)(C). Plaintiffs fail to allege that, with knowledge of this regulatory requirement, they reasonably relied on MetLife to disclose its complex actuarial methodology to prospective insureds. Indeed, the Complaint is utterly devoid of any allegation that Plaintiffs relied on any particular methodology in deciding to purchase their policies.

Because the Complaint fails to allege a material false statement or omission that Plaintiffs relief on, the Complaint fails to state a claim for fraud.

## IV. The Statutory Claims

Count III of the Complaint alleges that the allegations supporting Plaintiffs' claims of fraud under Missouri and Illinois law also establish that MetLife "violated applicable state statutory prohibitions against fraud and deceptive practices," including the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020, and section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505/2. Neither the district court in dismissing the Complaint as barred by the filed rate doctrine and Plaintiffs' failure to exhaust Missouri remedies, nor the parties' briefs on appeal separately address the Count III claims. We have little difficulty concluding that the Count III claims, like the fraud claims in Counts I and II, fail to state a plausible claim.

**A.** To recover under the MMPA, Plaintiffs must show that "(1) [they] leased or purchased a product or service from defendant; (2) primarily for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by § 407.020." Schulte v. Conopco, Inc., 997 F.3d 823, 825-26 (8th Cir. 2021). The Act declares unlawful deceptive practices as defined in § 407.020.2(1). Plaintiffs allege that the same conduct giving rise to their fraud claims constitutes a deceptive practice under the MMPA. The statute says otherwise: "Nothing contained in this section shall apply to . . . [a]ny institution, company, or entity that is subject to chartering, licensing, or regulation by the director of the department of commerce and insurance under chapter 354 or chapters 374 to 385." § 407.020.2(2). As the parties and the district court extensively explain, MetLife is subject to regulation by the Director of the Department of Commerce and Insurance. See, e.g., Mo. Rev. Stat. §§ 374.046, 379.321(1). Therefore, Plaintiffs

-10-

have no remedy under the MMPA.  See Rashaw v. United Consumers Credit Union, 685 F.3d 739, 745 (8th Cir. 2012).

**B.**  Plaintiffs advance the same argument for their Count III claim under the ICFA, an Illinois consumer protection law that similarly declares unlawful "a deceptive act or practice [that] occurred in the course of trade or commerce [and proximately caused] actual damage to the plaintiff."  See Toulon, 877 F.3d at 739-40. Like the MMPA, the ICFA has an important limitation on liability for regulated acts and practices: "Nothing in this Act shall apply to . . . [a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."  815 Ill. Comp. Stat. § 505/10b(1); see Price v. Philip Morris, Inc., 848 N.E.2d 1, 38-51 (Ill. 2005).  The Illinois Director of Insurance is authorized by statute to investigate "any person engaged in the business of insurance," hold hearings, and issue cease and desist orders to any person "engaged in any unfair method of competition or in any unfair or deceptive act." 215 Ill. Comp. Stat. § 5/425-27.

Plaintiffs allege the following statement in the MetLife policy was deceptive: "Your benefit will automatically increase each year with no corresponding increase in premium.  The amount of the increases are equal to five percent (5%) of the benefit amounts in effect at the end of the prior Policy Year."  As noted, Department of Insurance regulations require that long-term care insurers file their initial premium rates; offer the option to purchase inflation protection providing increased benefit levels to account for anticipated increases in the costs of covered long-term care services for a premium the insurer expects to remain constant; and may reserve the right to increase premiums but must file a notice of any proposed increase that includes an actuarial memorandum justifying the increase.  Ill. Admin. Code tit. 50, §§ 2012.64, 2012.80, 2012.112.

The ICFA "safe-harbor" applies not only to statutes but also to regulations. Price, 848 N.E.2d at 38. The deceptive affirmative statement alleged in Count III was not merely authorized, it was required under Illinois law. The Illinois regulations required MetLife to state that its initial premium rates are expected to remain constant but may be raised, exactly what Plaintiffs claim is deceptive. Moreover, the subsequent premium increases were submitted for the required regulatory review. "[F]ull compliance with applicable disclosure requirements is a defense . . . to [Plaintiffs'] claim of fraud based on the failure to make additional disclosures." Id. at 41. Thus, 815 Ill. Comp. Stat. § 505/10b(1) bars Plaintiffs' Count III claim for fraud and fraudulent non-disclosure. And even if not barred by this Illinois safe-harbor statute, the Count III ICFA claim is substantively similar to the fraud claims and fails for the same reasons. See Toulon, 877 F.3d at 739-40.

## V. The Implied Covenant Claim

In Count IV of the Complaint, Plaintiffs allege breach of the implied covenant of good faith and fair dealing under Missouri and Illinois law:

113. Met Life's conduct deprived Plaintiffs of the right to receive the very benefits that were expressly contemplated by the Policies and the Rider.

114. Any reasonable person in the position of Plaintiffs would be justified in believing that there was no relationship between the increased daily benefit amount and future rate increases. Met Life went to great lengths to affirmatively create that belief through the express statements it included in the Policy.

115. Such promise is not contrary to any express provision in the Policies and Rider.

-12-

116. Met Life's conduct essentially rendered the promises of the Rider worthless to Plaintiffs and Met Life's conduct was inconsistent with the Rider's express purpose. As a result, Met Life breached its duty of good faith and fair dealing.

On appeal, Plaintiffs argue the district court erred in not separately addressing Count IV because they adequately alleged a breach of the implied covenant. We disagree.

Under Missouri law, every contract includes an implied covenant of good faith and fair dealing, but "there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." Park Irmat Drug Corp. v. Express Scripts Holding Co., 911 F.3d 505, 514 (8th Cir. 2018) (quotation omitted). Here, the Inflation Protection Rider explicitly advised policy purchasers that MetLife retained the right to increase premiums. Plaintiffs allege that the eventual increase in premiums rendered misleading its earlier representation there would be no "corresponding increase" in premiums as the benefit amounts increased. Again, three premium increases over a fifteen year period are not evidence they "corresponded" to the annual increases in benefit amount. More importantly, the increases were expressly permitted by the terms of the Rider. There was no breach of the implied covenant of good faith and fair dealing.

Plaintiffs' Count IV claim fares no better under Illinois law. Under Illinois law, "the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract. . . . Instead, the covenant merely 'guides the construction of the explicit terms in the agreement.'" Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F.3d 785, 792 (7th Cir. 1995) (citations omitted). "The obligation of good faith, therefore, creates neither a cause of action sounding in tort nor its own *sui generis* cause of action." Echo, Inc. v. Whitson Co., Inc., 121 F.3d 1099, 1106 (7th Cir. 1997). Because the explicit terms of the Rider authorized the increases,

MetLife did not violate an implied covenant.  This doctrine "does not allow parties to add terms to a contract that are not there."  <u>Hartford Accident & Indem. Co. v. Lin</u>, 97 F.4th 500, 510 (7th Cir. 2024).  The implied covenant claim in Count IV fails to state a claim under Missouri and Illinois law.

## VI. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.  After oral argument, with the case submitted, Plaintiffs filed two motions to supplement the extensive record on appeal with recent documents -- a notice MetLife sent to its long-term care policyholders and a Missouri Department of Commerce and Insurance letter and email sent to an unrelated insurer's unidentified policyholder -- allegedly supporting Plaintiffs' argument that the district court erred in applying the filed rate doctrine under Missouri law.  We rarely consider materials that were not presented to the district court.  <u>See</u> <u>Bell v. Pfizer, Inc.</u>, 716 F.3d 1087, 1092 (8th Cir. 2013).  Here, as the additional documents relate only to the filed rate doctrine issue we need not consider, we deny the motions as moot.

_____