In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1510

SOPHIE P. TOULON,

*Plaintiff-Appellant,*

*v.*

CONTINENTAL CASUALTY COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-138 — **Manish S. Shah**, *Judge.*

ARGUED FEBRUARY 14, 2017 — DECIDED DECEMBER 14, 2017

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. In September 2002, Sophie Toulon applied for a Preferred Solution long-term care insurance policy (the Policy) issued by Continental Casualty Company. Continental provided Toulon with a "Long Term Care Insurance Personal Worksheet," along with the application, to help her determine whether the Policy would work for her,

given her financial circumstances. The Worksheet discussed Continental's right to increase premiums and how such increases had been applied in the past. Toulon decided not to fill out the Worksheet but she signed it and submitted it with her application.

Toulon's Policy became effective on July 15, 2002 and it stated that although Continental could not cancel the Policy as long as each premium was paid on time, Continental could make changes to the premium rates. But there was a "10-Year Rate Guarantee Rider" which stated that premiums would not be increased during the first ten years after the effective coverage date. In September 2013, more than eleven years after the 2002 coverage date, Continental raised Toulon's premiums by 76.5%.

In January 2015, Toulon sued Continental, on behalf of herself and all others who had purchased the Policy, claiming that Continental had engaged in a scheme to lure elderly people into purchasing the Policy by offering artificially low premiums for the first ten years and by not disclosing that Continental would raise its rates substantially just at the time when elderly insureds would likely need to make claims. Toulon amended her complaint twice, ultimately asserting claims for fraudulent misrepresentation, fraudulent omissions, unjust enrichment, and violation of the consumer fraud and deceptive trade practices acts of all fifty states and the District of Columbia. Continental moved to dismiss the Second Amended Complaint (the Complaint) under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and the district court granted the motion.

Toulon now appeals from the district court's dismissal of the Complaint. We agree with the district court that Toulon

failed to state claims for fraudulent misrepresentation, because she did not identify a false statement made by Continental, or for fraudulent omission, because Continental did not owe Toulon a duty to disclose. The district court also properly dismissed Toulon's claim for violation of the Illinois Consumer Fraud and Deceptive Practices Act (ICFA), which as an Illinois resident was the only consumer fraud statute applicable to Toulon, since she did not identify (1) a deceptive practice engaged in by Continental, (2) a material omission of Continental, or (3) an unfair practice. Finally, the district court was correct to dismiss the count alleging unjust enrichment because Toulon's claims of fraud and statutory violation, upon which her unjust enrichment claim was based, were legally insufficient and an express contract governed the parties' relationship.

## I. BACKGROUND

Continental began selling the Policy in 1998. Four years later, Toulon applied for and ultimately bought the Policy in 2002, which was sold to her by her husband, Gregory Toulon, an insurance agent. In addition to the application, Continental asked applicants to fill out a Worksheet which provided,

> [L]ong term care insurance can be expensive, and is not appropriate for everyone. State law requires the insurance company to ask you to complete this worksheet to help you and the insurance company determine whether you should buy this policy. …

> Premium

> … The company has a right to increase premiums in the future. The company has sold

long term care insurance since 1965 and has sold this policy since 1998. The company has not raised its rates for this policy. However, the company did raise rates by 15% in 1995 on long term care policies sold seven to 12 years ago that provided essentially similar coverage.

Have you considered whether you could afford to keep this policy if premiums were raised, for example, by 20%?

Instead of completing the Worksheet, Toulon checked off and signed a statement at the bottom of the Worksheet, which said, "I choose not to complete this information." Immediately below this, her husband and insurance agent, Gregory Toulon, indicated that he "explained to the applicant the importance of completing this information."

Continental issued the Policy to Toulon, with an effective date of coverage of July 15, 2002 and it stated in large bold letters on the first page, "GUARANTEED RENEWABLE FOR LIFE/PREMIUMS SUBJECT TO CHANGE." Under this heading, the Policy stated that Continental cannot cancel or refuse to renew the Policy and cannot change the Policy without the policyholder's consent. It then provided, "However, We may change the premium rates. Any change will apply to all policies in the same class as Yours in the state where the policy was issued. We will notify You in writing 31 days before Your premium changes." The policy had a "10-Year Rate Guarantee Amendment Rider" attached, which amended the "Premiums Subject to Change" provision by stating: "In no event will the premium rate increase during the initial 10 years after your Effective Date of Coverage." In 2013, eleven years after her policy was issued and after her

ten-year rate guarantee rider had expired, Continental increased premiums for the Policy by 76.5% to $3,140.18 annually.

## A. District Court Proceedings

On January 8, 2015, Toulon filed a complaint in the Northern District of Illinois, alleging that Continental falsely represented the likelihood and magnitude of premium increases on the Policy. The complaint stated that she was bringing the action "on behalf of herself, and all others similarly situated." Toulon asserted that the district court had jurisdiction over the action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 (CAFA), "because at least one member of the [c]lass is a citizen of a different state than the defendant, there are more than 100 members of the [c]lass, and upon information and belief the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs."

Toulon filed her First Amended Complaint, which the district court dismissed for failure to state a claim. Toulon then filed a Second Amended Complaint on September 11, 2015, alleging four causes of action: (1) fraudulent misrepresentation, (2) fraudulent omissions, (3) unjust enrichment, and (4) violations of the consumer fraud and deceptive trade practices acts of all fifty states and the District of Columbia. The Complaint alleged that Toulon was 68 years old at the time that she applied for the Policy and her highest level of education was high school. Toulon also stated that she had no knowledge related to long-term care insurance at the

time she purchased the Policy and did not know what factors, variables and assumptions determined the initial premiums.

According to Toulon, Continental "knew that it would have to drastically increase premiums in the future and that disclosing the need to do so would scare away customers." So, Toulon maintains, Continental devised a scheme to offer the Policy with artificially lowered premiums and rate-stabilizing riders, without disclosing that it would implement significant premium rate increases once the rate-stabilization period ended.

Continental filed a motion to dismiss the Complaint for failure to state a claim. The district court granted the motion and dismissed the Complaint with prejudice. On appeal, Toulon challenges the district court's dismissal and maintains that the Complaint adequately states claims for fraudulent misrepresentation, fraudulent omissions, unjust enrichment, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA).[1]

## II. ANALYSIS

### A. Subject Matter Jurisdiction Exists Pursuant to the Class Action Fairness Act of 2005 (CAFA)

Before we address the merits of the district court's decision granting Continental's motion to dismiss, we must first address whether the district court properly asserted jurisdiction over Toulon's Complaint. As noted above,

---

[1] Although the Complaint alleges violations of the consumer fraud and deceptive practices acts of all fifty states and the District of Columbia, Toulon is a citizen of Illinois and the parties address only ICFA in their briefs so, like the district court, we will analyze whether the Complaint states a claim under ICFA.

Toulon alleged in her Complaint that the district court had jurisdiction under CAFA which provides, so long as other requirements are met that are satisfied here,

> The district courts shall have original jurisdiction of … a class action in which—
>
> (A) Any member of a class of plaintiffs is a citizen of a State different from any defendant …

28 U.S.C. § 1332(d)(2)(A). Although Toulon and Continental are both citizens of Illinois, because CAFA requires only "minimal diversity," jurisdiction was appropriate in the district court as long as at least one person who would be a member of the class Toulon sought to represent was a citizen of a state other than Illinois.

In her Complaint, Toulon defined the class she sought to represent as

> [a]ll persons who purchased 'Preferred Solution' long-term care insurance, in the United States from any of the Defendants or a subsidiary or affiliate thereof at any time during the period from January 1, 1998 to the present.

She further alleged that "[t]he 'Preferred Solution' policies were approved to be sold in at least 32 states," that "[t]he Policy was sold in Illinois, as well as throughout the country," and that "the members of the Class are geographically dispersed throughout the United States." Based on these allegations, Toulon concluded that "at least one member of the Class is a citizen of a different state than defendant." Continental agreed with Toulon that minimal diversity existed and that jurisdiction was appropriate under CAFA.

The parties submitted a joint status report to the district court stating as much.

When Toulon submitted her Circuit Rule 3(c)(1) docketing statement to this court, she stated that the district court had jurisdiction under CAFA because, among other reasons, "a member of a class of plaintiffs is a citizen of a state different from defendant." We found this statement insufficient to establish minimal diversity and ordered Toulon to identify the name and state of citizenship of at least one plaintiff whose citizenship is diverse from Continental. Toulon was unable to identify a specific class member who is a citizen of a state other than Illinois. However, Continental moved to supplement the record with affidavits from two of its employees to establish the requisite jurisdictional facts. Continental brought the motions to supplement under 28 U.S.C. § 1653 which provides that "[d]efective allegations of jurisdiction may be amended upon terms, in the trial or appellate courts."

The first affidavit, from Ciaran O'Loughlin, Assistant Vice President of Long-Term Care Pricing, states that of the more than 170,000 Preferred Solution insurance policies sold by Continental in the United States between 1998 and 2003, more than 158,000 were issued outside of Illinois. The second affidavit, from Colleen Broomhead, Director of Regulatory Operations, identified ten people who purchased Preferred Solution policies during the relevant time period and who reside in a state other than Illinois. The Broomhead affidavit contains details about the significant ties each person has to his or her home state, which is not Illinois, such as living at the same address for many years, having in their home state a driver's license, a job, and/or a registered vehicle, and

receiving medical care there. Such details establish that the people described the Broomfield affidavit have resided in states other than Illinois with the intent to remain in those other states, and therefore they are citizens of states other than Illinois. *Myrick v. WellPoint, Inc.*, 764 F.3d 662, 664 (7th Cir. 2014) ("[c]itizenship means domicile (the person's long-term plan for a state of habitation) rather than just current residence").

We grant Continental's motions to supplement the record with the O'Loughlin and Broomhead affidavits pursuant to 28 U.S.C. § 1653. *Stockman v. LaCroix*, 790 F.2d 584, 587 (7th Cir. 1986) (leave granted under 28 U.S.C. § 1653 to supplement record with affidavits regarding the citizenship of general and limited partners to establish complete diversity); *see also Gold v. Wolpert*, 876 F.2d 1327, 1329 n.2 (7th Cir. 1989). With the affidavits submitted, we find there is minimal diversity, and the district court properly asserted jurisdiction under CAFA.

We note that, despite the fact that Toulon chose to file her case in federal court pursuant to CAFA, Toulon opposed Continental's motion to supplement the record with affidavits to confirm that minimal diversity existed. She also filed a Motion for Conditional Relief, asking that if we did not find sufficient evidence that minimal diversity existed, that we vacate the district court's opinion and order the case dismissed without prejudice. Because we have found that minimal diversity exists in this case, and that the district court

properly asserted jurisdiction under CAFA, we deny Toulon's Motion for Conditional Relief.

## B. Standard of Review

"Our review of the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is de novo." *Golden v. State Farm Mut. Auto. Ins. Co.*, 745 F.3d 252, 255 (7th Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, if accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We "must accept as true all of the allegations contained in a complaint" that are not legal conclusions. *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Claims of fraud are "analyzed under the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). … Rule 9(b) requires a pleading to state with particularity the circumstances constituting fraud. … [This] ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736–37 (7th Cir. 2014).

## C. Toulon's Complaint Failed to State Claim for Fraudulent Misrepresentation

### 1. No Affirmative False Statements of Material Fact

In Count I of the Complaint, Toulon quotes statements from the Worksheet that Continental has the right to increase premiums in the future; Continental has sold the Policy since 1998 and has not raised premiums for it; and in 1995

Continental raised premiums by 15% for a similar long-term care policies. Toulon also quotes the question from the Worksheet: "Have you considered whether you could afford to keep this policy if the premiums were raised, for example, by 20%?" In addition, she quotes the statement from the Policy, "However, We may change the premium rates." She asserts that "one of more" of the quoted statements from the Worksheet and the statement from the Policy that Continental "may" change the premium rates are false statements of material fact. She also alleges that these statements falsely imply that a premium rate increase is uncertain, but if there is a premium rate increase, it will be limited to 15 to 20%. Because Continental allegedly knew that it would impose a substantial premium rate increase more than ten years in the future, Toulon asserts that the statements were "express and implied misleading representations" that Toulon and the class relied on to their detriment. So, Toulon concludes that Continental committed fraudulent misrepresentation.

To state a claim for fraudulent misrepresentation a plaintiff must allege:

> (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance upon the truth of the statement; and (5) damage to the plaintiff resulting from such reliance.

*Doe v. Dilling*, 888 N.E.2d 24, 35–36 (Ill. 2008) (citations omitted). We agree with the district court that Toulon has failed to adequately explain the first element of her claim because she does not allege how the statements in the Worksheet or the Policy are false. She does not and cannot

challenge the accuracy of the statements in the Worksheet that Continental (1) had the right to increase premiums in the future; (2) offered the Policy since 1998; (3) had not yet raised its rates on the Policy; and (4) in 1995 had raised its rates on a similar long-term care policies by 15%. Similarly, Toulon does not and cannot explain how a question regarding whether the applicant can afford the Policy if rates are raised by, for example, 20% is false. A question, by its very nature, cannot be a false statement of material fact. This is especially true here since the question Toulon identifies as false or fraudulent came directly from the Illinois regulation that dictates that content of the Worksheet. *See* 50 Ill. Adm. Code 2012 Ex. F (West 2002).

In addition, Toulon does not explain how the statement that Continental "may" change rates is false. She asserts that because Continental knew that it would increase premiums after the rate-stabilization period ended, it misrepresented a certainty that rates would change by stating that there was only a mere possibility that rates "may" change. Like the district court, we are not convinced that stating that the rates "may" change, meaning they might or might not change, would be a falsehood, even if Continental knew the rates would change. More importantly, we believe Toulon is misinterpreting the meaning of the word "may" in the sentence. When read in context, the word "may" seems to be used in the sense of "can" or "has the right to" rather than "might possibly." The full context in which the sentence appears is as follows:

> GUARANTEED        RENEWABLE        FOR
> LIFE/PREMIUMS SUBJECT TO CHANGE

> Your policy will remain in effect during Your lifetime as long as each premium is paid on time. We cannot cancel or refuse to renew Your policy. We cannot change Your policy without Your consent. However, We may change the premium rates. Any change will apply to all policies in the same class as Yours in the state where the policy was issued. We will notify you in writing 31 days before Your premium changes.

The heading of the section, which appears in bold capital letters on the first page of the Policy, indicates that while the Policy is guaranteed renewable for life, the premiums are not guaranteed to stay the same and are subject to change. The text that follows bears this out. The second and third sentences explain what Continental "cannot" do—it cannot cancel or refuse to renew the Policy, and it cannot change the Policy without the policyholder's consent. Then, the fourth sentence, which is highlighted by Toulon, starts with "However," and goes on to state, "We may change the premium rates." The word "However" indicates that what follows is an action Continental "can" take, as opposed to the actions it "cannot" take. So, in the context of the preceding sentences, the word "may" means "can" and not "might possibly." *See Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 890 (8th Cir. 2009) (long-term care insurance policy stated, "We cannot cancel or refuse to renew this Policy. … We can, however, change Your premiums based on Your premium class.").

This is further reinforced by the sentences that follow, which explain to whom such a rate change would apply as

well as how and when it would be communicated. It makes more sense to give this information after confirming that Continental has the right to change the rates as opposed to giving the information even though the rates "may or may not" change. Finally, this reading of the sentence is consistent with the statement in the Worksheet that "[t]he company has a right to increase premiums in the future." Because the sentence, "[h]owever, We may change the premiums rates" means that Continental "can" or "has the right to" change the premium rates, Toulon cannot allege that the sentence is a false statement of material fact. So, she has not identified any explicit, false statements of material fact to satisfy the first element for a claim of fraudulent misrepresentation. *See id*. at 894 (no fraudulent misrepresentation when rates were raised for long-term care insurance policy because language in policy made clear that "plaintiffs were not guaranteed a level premium for life.").

## 2. No Implied Falsehood or Justifiable Reliance

Even if Continental did not make any explicit false statements of material fact, Toulon maintains that her claim for fraudulent misrepresentation should survive because Continental falsely implied that "that the likelihood and extent of future premium rate increases was unknown, but if necessary would fall in a range of 15 to 20% … ." She bases this assertion on the Worksheet's statement that in 1995 Continental had raised its rates by 15% on similar long-term care policies and it included in the Worksheet the question, "Have you considered whether you could afford to keep this policy if the premiums were raised, for example, by 20%?" This statement and question, whether considered separately

or together, cannot be interpreted as a promise that Continental would not raise its premium rates by more than 20%.

As noted earlier, Illinois regulations required Continental to issue the Worksheet along with the application for its long-term care policy and the regulations also dictated what should be contained in the Worksheet. 50 Ill. Admin. Code 2012.123(c)(2) (West 2002); 50 Ill. Adm. Code 2012 Ex. F (West 2002). Both the statement about how much Continental had raised the premium on similar policies in the past and the question about whether the applicant could afford to keep the policy if the premiums were raised by 20% came directly from the model Worksheet contained in the Illinois regulation. 50 Ill. Adm. Code 2012 Ex. F (West 2002). While it is true that the question about whether the applicant could afford the policy if the premiums were raised by 20% was optional, rather than required by the regulation, this distinction cannot convert a hypothetical question suggested by a regulation into a false promise to never raise premium rates beyond 20%. We agree with the district court's conclusion that "the statements contained in the Worksheet and Policy were not of the type from which 'fraud is the necessary or probable inference.'" *Toulon v. Continental Casualty Co.*, 2016 WL 561909 at *3 (N.D. Ill. Feb. 12, 2016) (quoting *Connick v. Suzuki Motor Co. Ltd.*, 675 N.E.2d 591 (Ill. 1996)).

Toulon contends that the statement about Continental's previous 15% rate increase on similar policies and the question about being able to afford the Policy if premium rates increased by 20% were "tacit misrepresentations" that the premiums would not increase by more than 20% and cites *Glazewski v. Coronet Ins. Co.*, 483 N.E.2d 1263 (Ill. 1985) in

support. However, *Glazewski* is distinguishable from the instant case. In *Glazewski*, the Illinois Supreme Court found the plaintiff had stated a claim for fraud because "the issuance of coverage by an insurance company in return for a premium is a tacit representation to the consumer that the coverage has value," yet the policy purchased by the plaintiffs in *Glazewski* had no value. *Id.* at 1266. In contrast, in Toulon's case, the Policy she paid for with a rate-stabilized premium for ten years had substantial value, even if she did not make a claim during that period. *Charles Hester Enter., Inc. v. Illinois Founders Ins. Co.*, 499 N.E.2d 1319, 1324 (Ill. 1986) (no false statement of material fact because insurance policy had value). Finally, there were no actions or statements by Continental that "tacitly" represented that premiums would never be raised, or if they were raised, that the increase would not exceed 20%.

Furthermore, if Toulon or others who purchased the Policy mistakenly interpreted the statements above to be an implied promise to not raise premiums more than 20%, reliance on such an implied promise would not be justified since the Worksheet stated that "[t]he company has a right to increase premiums in the future" and it did not state that this right was limited to only 20%. Similarly, the Policy stated "Premiums Subject to Change" and "We may change the premium rates," without putting a limitation of 20%, or any other percentage, on either statement. Given the many statements that premiums were subject to change without limitation, neither Toulon nor any class members could have justifiably relied on an allegedly implied promise to not raise premium rates more than 20%. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 882-83 (7th Cir. 2005). Because Toulon failed to adequately allege a false representation of material fact and

justifiable reliance, the district court was correct to dismiss her claim for fraudulent misrepresentation.

### D. Complaint Did Not State Claim for Fraudulent Omissions

In Count II, Toulon attempts to state a claim for fraudulent omissions (also known as fraudulent concealment), alleging that Continental fraudulently failed to disclose that it was going to raise premium rates on the Policy far in excess of 20% after the rate-stabilization period ended. "In order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick*, 174 675 N.E.2d at 593. A duty to disclose may be based on a fiduciary relationship or a relationship of trust and confidence where "defendant [is] in a position of influence and superiority over plaintiff." *Id.* Or it may arise when a defendant tells a half-truth and then becomes obligated to tell the full truth. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397-98 (7th Cir. 2009). Toulon admits that under Illinois law, no fiduciary relationship exists between an insurer and an insured. Nevertheless, she maintains that Continental had a duty to disclose the substantial premium increase because she had a special relationship of trust and confidence with Continental and because Continental told a half-truth that premiums "may" increase and therefore was obligated to tell the full truth that premiums would increase.

Before we analyze whether Continental had a duty to disclose a substantial premium increase, we must first examine whether Toulon pled sufficient facts to support her contention that Continental "knew" that, more than ten years in the future, it would seek to impose an increase in its

premium rates "far in excess of 20%." To support this contention, Toulon cites various studies and standards, almost all of which were published after Continental introduced and priced the Policy in 1998. Toulon also cites Continental's experience, but as was disclosed in the Worksheet, Continental's experience had been that in the ten years before it sold the Policy to Toulon, it had increased premiums on similar policies by 15%. So, its own experience would not dictate that Continental knew it would increase rates "far in excess of 20%" over a decade later.

Also, regardless of whether Continental knew it would want to increase rates substantially many years in the future, it would not be able to do so without regulatory approval. Despite Toulon's allegations in the Complaint to the contrary, Continental could not "know" whether, more than ten years in the future, the regulators would approve a rate increase. For all these reasons, it seems just as likely that Continental did not "know" at the time it priced and issued the Policy in 1998 that in 2013 it would seek to, and be able to, raise its rates "far in excess in 20%." *See Twombly*, 550 U.S. at 570 (need to allege sufficient facts to push claim "across the line from conceivable to plausible").

However, even if Toulon had alleged sufficient facts to support her claim that Continental knew it would plan to and be able to substantially increase rates over ten years in the future, we cannot find she has sufficiently alleged that Continental had a duty to disclose this information. In Illinois, "the standard for identifying a special trust relationship is extremely similar to that of a fiduciary relationship. … [S]tate and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary

one." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) (internal quotation marks and citations omitted). In *Wigod*, we examined a number of Illinois cases and concluded that "the defendant accused of fraudulent concealment must exercise overwhelming influence over the plaintiff … [and] asymmetric information alone does not show the degree of dominance needed to establish a special trust relationship." *Id.* at 572–73 (internal quotation marks and citations omitted).

Nevertheless, asymmetric information is the main reason Toulon gives in the Complaint to support her contention that she and Continental had a special relationship of trust and confidence. Toulon alleges that her "highest level of education was high school" and she "had no knowledge related to Long Term Care Insurance." But Toulon studiously avoids any mention in the Complaint about what knowledge her husband, who was the insurance agent who sold her the Policy, had regarding long-term care insurance. Toulon also maintains that she "placed her trust and confidence in Continental based on its decades-long experience with long-term care insurance" compared to her "relative inexperience and lack of sophistication." Yet, to the extent that Toulon claims that she relied on Continental to help her determine if the Policy was affordable for her, such a claim is undermined by the fact that she did not fill out the Worksheet and did not share the necessary financial information for Continental to help her make that determination.

We agree with the district court that if Toulon's allegations were sufficient to support a claim of a special relationship that resulted in a duty to disclose, "then any insurer that complied with Illinois's disclosure requirements would find itself in such a relationship with every elderly insured who had been

unsophisticated in the ways of insurance at the time of purchase. Such a holding would contradict Illinois's rule against insurers being fiduciaries as a matter of law." *Toulon*, 2016 WL 561909 at *4.

Toulon asserts that an alternative reason why Continental had a duty to disclose is because by stating that it "may" impose a rate increase, Continental told a half-truth that then imposed on it a duty to tell the whole truth that Continental definitely would impose a rate increase. *Crichton*, 576 F.3d at 398 ("a duty to disclose may arise … if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth'"). As we said, we do not believe that the sentence, "[h]owever, We may change the premium rates" means that it is possible that Continental will change the premium rates. We think it means Continental has the right to change the premium rates, which cannot be deemed to be a half-truth. For this reason, Continental had no duty to disclose their alleged knowledge that they would increase premium rates substantially at the end of the rate-stabilization period.

### E.  Toulon's Complaint Did Not State Claim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act (ICFA)

#### 1. Toulon Does Not Sufficiently Allege Continental Engaged in Deceptive Act

Based on the same allegations that she used to support her claims for fraudulent misrepresentation and fraudulent omissions, Toulon alleges that Continental violated ICFA by failing to disclose that premiums would definitely increase

after the rate-stabilization period ended and that the increase would be far in excess of 20%. The elements of a claim under ICFA are:

> (1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception. … [A] complaint made pursuant to the ICFA must be pled with the same specificity as that required under common law fraud.

*Davis*, 396 F.3d at 883 (internal quotation marks and citations omitted). "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Id.* at 884.

We concur with the district court that Toulon failed to adequately allege that Continental engaged in a deceptive act or practice. Toulon again asserts that Continental's statements that it "may" change the premium rates and that it previously raised rates on similar long-term care policies by 15%, combined with the question in the Worksheet asking if applicants could afford the policy if premiums were raised, for example, by 20%, created a false impression that it was uncertain whether Continental would raise rates and, if it did, it would raise rates by no more than 15 or 20%. We disagree. As we explained when discussing Toulon's fraudulent misrepresentation claim, we do not believe the statements and question can be interpreted as a promise that rates would

not be raised more than 15 or 20%. In addition, the statement "Premiums Subject to Change" from the Policy and the explicit statement in the Worksheet, "The company has a right to increase premiums in the future," should have made clear to applicants that Continental could change the premium rates without limitation.

Similarly, Toulon did not adequately allege that Continental violated ICFA by failing to disclose a material fact. Toulon asserts that Continental "[c]oncealed, suppressed and omitted that it would significantly increase premium rates after the expiration of the rider period …" First, we are not convinced that Toulon alleged sufficient facts to support her contention that Continental "knew" that more than ten years in the future it would seek to, and be able to raise rates "far in excess of 20%." Second, Continental never stated that it would not raise premium rates or that it would not raise premium rates more than 20%. To the contrary, Continental made clear it could raise premium rates, without limitation, after the rate-stabilization period ended. So, if Continental "knew" that, over ten years in the future, it could and would raise premiums more than 20%, its failure to disclose this to Toulon and other applicants means, at worst, that Continental could have given applicants more detailed information. This is not sufficient to state a claim under ICFA. *Phillips v. DePaul University*, 19 N.E.3d 1019, 1030 (Ill. App. Ct. 2014) (no ICFA violation where information published by defendant "certainly could have been more specific" but where defendant made "no affirmative misrepresentation").

Another reason why Toulon failed to state a claim for omission of a material fact under ICFA is that she did not plead that she would not have bought the Policy if she had

known about the premium increase after the expiration of the rate-stabilization period. "An omission is 'material' if the plaintiff would have acted differently had it been aware of it, or if it concerned the type of information upon which it would be expected to rely in making its decision to act." *DOD Technologies v. Mesirow Ins. Services, Inc.*, 887 N.E.2d 1, 10 (Ill. App. Ct. 2008). Toulon alleged that "Continental knew that if it advised Sophie P. Toulon … that there would be a certain and significant increase in premium rates in the future, that it would dissuade her … from obtaining long term care insurance from Continental." This statement is not the same as an affirmative statement that Toulon would not have bought the Policy had she known there was going to be a substantial rate increase more than ten years in the future. Perhaps Toulon cannot make such a statement because, as her counsel stated at oral argument, Toulon continues to maintain the Policy by paying the increased premium. Regardless of the reason, the Complaint does not include an affirmative statement that, had she known about the premium increase in advance, Toulon would not have bought the Policy. This is an additional reason why Toulon has failed to state a claim that Continental made a "material" omission in violation of ICFA. *Id.* (no claim stated for omission of material fact in violation of ICFA because plaintiff did not allege it would not have purchased insurance had it known about contingent commissions received by defendant); *see also Galvan v. Northwestern Memorial Hosp.*, 888 N.E.2d 529, 541 (Ill. App. Ct. 2008).

### 2. Toulon Does Not Sufficiently Allege That Continental Engaged in Unfair Practice

Toulon also asserts that Continental violated ICFA because, by failing to disclose the substantial premium increase that would take place more than ten years in the future, Continental engaged in an "unfair practice." When assessing whether a practice is "unfair" under ICFA, the following factors are considered: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 609 (7th Cir. 2013) (citations omitted).

In her brief Toulon specifies two provisions of the Illinois Administrative Code that are the public policies that were allegedly violated by Continental's failure to disclose a significant premium increase after the rate-stabilization period ended. The first Administrative Code section she cites cannot be relied on by Toulon because it applies to "any traditional long-term care policy issued … on or after January 1, 2003," and Toulon purchased the Policy in 2002. 50 Ill. Adm. Code 2012.64(a) (West 2002). The other Administrative Code section, 50 Ill. Adm. Code 2012.122(b)(4) (West 2002), prohibits "[m]isrepresenting a material fact in selling or offering to sell a traditional long-term care insurance policy." However, as we have stated above, none of the statements from the Worksheet or Policy identified by Toulon misrepresents a material fact, so this public policy was not violated by Continental.

Toulon has also failed to allege facts to support a claim that Continental's actions in selling the Policy to Toulon were "immoral, unethical, oppressive, or unscrupulous." *Cohen*,

735 F.3d at 609. The Policy and Worksheet made clear that Continental had the right to raise premiums after the rate-stabilization period ended. "[T]here is nothing oppressive or unscrupulous about giving a counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so." *Id.* at 610. If Toulon did not want to buy the Policy, she could have looked elsewhere to determine if other companies were selling long-term care policies that did not have rates that could be raised in the future. Because Toulon was in no way forced to buy the Policy, "there was a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness …" in Continental's sale of the Policy to Toulon. *Id.* (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 962 (Ill. 2002)).

Finally, Toulon does not adequately allege that Continental caused her substantial injury under the law. She claims that the 76.5% increase in her premium significantly harmed her because it cost her thousands of dollars. Although we recognize that the increase in the premium was significant, under Illinois law, "charging an unconscionably high price generally is insufficient to establish a claim for unfairness." *Robinson*, 775 N.E.2d at 961. Moreover, to establish harm under ICFA, a plaintiff must show "that [s]he suffered substantial injury, and that [s]he could not avoid this injury." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Like the plaintiff in *Siegel*, Toulon cannot establish substantial injury because she could have avoided the harm by purchasing a different long-term care insurance policy from another company. For all these reasons, the district court was correct to dismiss Toulon's claim purporting to allege a violation of ICFA.

### F. Toulon Failed To State Claim For Unjust Enrichment

In Count III of the Complaint, Toulon alleged that Continental obtained contracts for insurance that allowed Continental to raise premiums by more than 15% through fraudulent misrepresentations. Toulon asserted that because Continental procured the insurance contracts "through illegal and improper means," Continental has been unjustly enriched by the premium payments made by Toulon and others in the class she seeks to represent. "Unjust enrichment does not constitute an independent cause of action. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, or, alternatively, it may be based on contracts which are implied in law." *Saletech, LLC v. East Balt, Inc.*, 20 N.E.3d 796, 808 (1st Dist. 2014) (internal quotation marks and citations omitted). We agree with the district court that Toulon failed to state a claim for unjust enrichment because she failed to state a claim for fraud or for violation of ICFA and because there is an actual contract governing the parties' relationship so one cannot be implied in law.

Toulon asserts that "because a legally sufficient claim has been established under the ICFA, Toulon has also established a legally sufficient claim for unjust enrichment." As explained earlier, Toulon's ICFA claim was not legally sufficient because she did not identify a deceptive act or practice of Continental, she did not adequately allege that Continental failed to disclose a material fact, and she did not sufficiently allege that Continental engaged in an "unfair practice." Because Toulon's ICFA claim, as well as her claims for fraudulent misrepresentation and fraudulent concealment, were all properly dismissed, the district court correctly

dismissed her unjust enrichment claim. *Ass'n Benefit Serv., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable") (emphasis in original).

An additional reason why Toulon's claim for unjust enrichment was properly dismissed was because there was an actual contract that governed her relationship with Continental. "A claim for unjust enrichment is 'based upon an implied contract; where there is a specific contract that governs the relationship of the parties, the doctrine has no application.'" *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (quoting *People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992)). There is no question that a contract for insurance governs the relationship between Toulon and Continental. Toulon refers to the Policy throughout the Complaint, including within the unjust enrichment count, and attached it as an exhibit to the Complaint. For this additional reason, the district court was correct to dismiss her claim for unjust enrichment. *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005) (unjust enrichment claim properly dismissed because plaintiff made references to retail installment contract between plaintiff and defendant throughout the complaint and attached contract as an exhibit to complaint).

### III. CONCLUSION

We AFFIRM the district court's dismissal of Toulon's Second Amended Complaint.