In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-1507

MASHALLAH, INC., and RANALLI'S PARK RIDGE, LLC,

*Plaintiffs-Appellants*,

*v.*

WEST BEND MUTUAL INSURANCE COMPANY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-05472 — **Charles P. Kocoras**, *Judge*.

_____

ARGUED SEPTEMBER 10, 2021 — DECIDED DECEMBER 9, 2021

_____

Before MANION, WOOD, and HAMILTON, *Circuit Judges*.

MANION, *Circuit Judge*. In this case, as in several others decided today, businesses seek insurance coverage for losses and expenses they allegedly sustained as a result of the COVID-19 pandemic and government orders issued in response to it. Mashallah, Inc., and Ranalli's Park Ridge, LLC, filed claims under the property insurance policies they had with West Bend Mutual Insurance Company. But those policies, presciently for purposes of this litigation, contained

express exclusions for losses and expenses caused by viruses. Based on these exclusions, West Bend denied the claims.

The businesses sued, alleging breach of contract or, if that should fail, entitlement to rebate of premiums. The district court granted West Bend's motion to dismiss the suit in its entirety under Rule 12(b)(6) for failure to state a claim, and the businesses appeal.

Because the district court properly determined that the virus exclusions barred coverage for the policyholders' purported losses and expenses and that the businesses failed to allege viable legal bases for rebate of premiums, we affirm.

## I. Background

In an appeal from an order granting a motion to dismiss, we must accept all well-pleaded facts as true and draw all reasonable inferences therefrom in the plaintiffs' favor. *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021).

Mashallah sells handcrafted jewelry at its store in Chicago. Ranalli's operates a bar and restaurant known as Holt's in Park Ridge, Illinois. Both purchased all-risk commercial property insurance policies from West Bend, a mutual insurance company organized under the laws of Wisconsin. Mashallah's coverage ran from August 1, 2019, to August 1, 2020; Ranalli's coverage ran from October 8, 2019, to October 8, 2020. At the end of these terms, both Mashallah and Ranalli's renewed their policies.

The businesses operated successfully until the arrival of COVID-19. After emerging in China "in early 2020" and making its first confirmed appearance in the United States on January 20, 2020, a novel coronavirus spread across the nation, causing the COVID-19 pandemic.

Beginning in March 2020, Illinois Governor J.B. Pritzker and other government officials issued several orders aimed at stopping or slowing the virus's spread. In particular, on March 20, 2020, Governor Pritzker ordered all individuals living in Illinois to stay at home except to perform specified "essential activities" and ordered "non-essential" businesses to cease all but minimum basic operations. Exec. Order No. 2020-10 (Mar. 20, 2020). Restaurants were considered essential businesses and permitted to continue selling food but solely for off-premises consumption. That meant Ranalli's operations were restricted to filling takeout and delivery orders. Mashallah, a jeweler, was not classified as an essential business and had to cease its retail activities. As a result, both businesses sustained heavy financial losses.

They filed insurance claims with West Bend. The two policies' coverage provisions are materially identical. As relevant here, West Bend agreed to pay for actual business income lost and necessary extra expenses incurred if they were caused by "direct physical loss of or damage to" the businesses' properties.

Both policies also contain virus exclusions, worded slightly differently. In Mashallah's policy, West Bend stated it would "not pay for loss or damage caused directly or indirectly" by "[a]ny virus … that induces or is capable of inducing physical distress, illness or disease." Ranalli's exclusion reads: "We will not pay for loss or damage caused by or resulting from any virus … that induces or is capable of inducing physical distress, illness or disease."

Finally, the policies address the issue of premium rebates. "In return for the payment of the premium, and subject to all the terms of this policy," West Bend agreed "to provide the

insurance as stated in this policy." If a premium was designated as an "advance premium," and if an audit showed that the premium paid in advance was greater than the "earned premium" for the policy period, West Bend committed to "return the excess."

West Bend denied the claims in April and May 2020, citing among other things the policies' virus exclusions. The businesses sued. Count I of the complaint seeks a declaratory judgment that West Bend is obligated to pay the claims under the terms of the policies. Count II alleges breach of contract and Count III asserts bad-faith denial of insurance claims in violation of 215 ILCS 5/155. If West Bend's denials of coverage are upheld, the complaint seeks alternative relief on behalf of a class. Count IV alleges that West Bend's retention of full premiums—despite decreased risks occasioned by the government-ordered reduction in insureds' business operations—constitutes unjust enrichment, requiring rebate. Count V further asserts that West Bend's retention of premiums in these circumstances violates the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA).

West Bend moved to dismiss under Rule 12(b)(6) for failure to state a claim. In addition to arguing that the businesses hadn't alleged "direct physical loss of or damage to" property necessary to invoke coverage, West Bend contended that the plain language of the virus exclusions precluded coverage. It further asserted that the unjust enrichment theory failed in the face of a valid contract and that the plaintiffs had not alleged any deceptive or unfair practice on West Bend's part.

The district court granted West Bend's motion. It bypassed the question of whether the businesses alleged direct physical

damage or loss and instead concluded that the policies' virus exclusions foreclosed any potential coverage. The district court also determined that the unjust enrichment and ICFA claims failed as matters of law. And because it concluded that any attempt to amend the complaint would be futile, the district court dismissed the case with prejudice. This appeal followed.

## II. Analysis

We review a district court's grant of a motion to dismiss on the pleadings *de novo*. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019). "To avoid dismissal, the complaint must 'state a claim to relief that is plausible on its face.'" *BancorpSouth, Inc. v. Fed. Ins. Co.*, 873 F.3d 582, 586 (7th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A federal court hearing a case under diversity jurisdiction "must attempt to resolve issues in the same manner as would the highest court of the state that provides the applicable law," *id.*, and the parties agree that Illinois law applies. "In the absence of Illinois Supreme Court precedent, we must use our best judgment to determine how that court would construe its own law," and we "may consider the decisions of the Illinois appellate courts." *Neth. Ins. Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013) (quotation marks omitted).

Under Illinois law, the interpretation of an insurance policy, like any other contract, is a question of law. *Sanders v. Ill. Union Ins. Co.*, 157 N.E.3d 463, 467 (Ill. 2019). A court's "primary function" in that interpretation "is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Id.* Policy terms that are "clear and unambiguous" must be given their "plain and ordinary meaning." *Id.*

A.

Before resolving the substantive legal issues presented in this appeal, we address two of the businesses' preliminary criticisms with the district court's analysis. First, they contend that the district court improperly skipped the threshold question of whether coverage under the policies was established and proceeded directly to the effects of the virus exclusions. This, the businesses assert, contributed to the district court's second misstep, namely, failing to use the proper standard to determine whether the exclusions apply. We see no merit to either contention.

The businesses cite no authority for the proposition that Illinois law requires a court to resolve the scope of an insurance policy's coverage before addressing the applicability of a potentially relevant exclusion. *Cf. Cohen Furniture Co. v. St. Paul Ins. Co.*, 573 N.E.2d 851, 854–55 (Ill. App. Ct. 1991) ("We need not address the defendant's argument concerning the scope of replacement cost insurance, since in any event we would find coverage excluded by the building laws exclusion.").

Nor, as a general legal matter, do we discern a problem with the district court's approach here. It's true that if an insured adequately alleges coverage under a policy, the burden shifts to the insurer to show that an exclusion applies. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). But this burden-shifting approach does not demand a rigidly sequential order of analysis. For example, in the burden-shifting *McDonnell Douglas* framework for analyzing disparate-treatment employment-discrimination claims, this

court has sometimes left unresolved the initial inquiry into whether a plaintiff has made a *prima facie* showing of discrimination and, assuming *arguendo* that the burden has been met, resolved an appeal based on the employer's successful rebuttal of any purported discrimination. *See, e.g.*, *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006); *see also Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 676–77 (6th Cir. 2013).

When the success of a claim turns on resolution in a plaintiff's favor of multiple independent issues, a district court may resolve the claim based on what it deems the simplest dispositive issue. In doing so, however, the court must take care to observe the proper allocation of burdens between the parties.

The businesses assert that the district court failed to observe that here. An insurer bears not only the burden of showing that an exclusion from coverage applies but that its applicability is "clear and free from doubt." *4220 Kildare, LLC v. Regent Ins. Co.*, 171 N.E.3d 957, 966 (Ill. App. Ct. 2020); *accord Country Mut. Ins. Co. v. Oehler's Home Care, Inc.*, 160 N.E.3d 977, 986 (Ill. App. Ct. 2019). Yet that exact phrase, the businesses note, is absent from the district court's opinion.

Although the district court did not incant those specific words, we are confident that the right standard was applied. The court recognized that West Bend bore the burden of affirmatively establishing that the virus exclusions apply and concluded that the exclusions were "clear and free from any ambiguity." *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, No. 20 C 5472, 2021 U.S. Dist. LEXIS 31816, at *6 (N.D. Ill. Feb. 22, 2021). We discern no material difference in this context between a "clear and free from doubt" standard and a "clear and free

from any ambiguity" standard, and at oral argument, the businesses couldn't articulate one. In any event, the district court cited its decision in another COVID-19 insurance case where it determined that virus-exclusion language similar to that involved here was "clear and free from doubt." *Id.* (citing *Riverwalk Seafood Grill Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20 C 3768, 2021 U.S. Dist. LEXIS 5899, at *6 (N.D. Ill. Jan. 7, 2021)).

In short, we see no error in the form of the district court's analysis or the standard of persuasion it applied.

## B.

Turning to the virus exclusions, the legal question is whether "the average, ordinary, normal, reasonable person for whom these policies were written would understand that the exclusion applies." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1006 (Ill. 2010) (quotation marks and citation omitted). We agree with the district court that the virus exclusions clearly and without doubt preclude coverage for the losses and expenses alleged by the businesses.

Recall that the virus exclusion in Ranalli's policy states that West Bend would "not pay for loss or damage caused by or resulting from any virus … that induces or is capable of inducing physical distress, illness or disease." Mashallah's exclusion is the same, save that it precludes payment more broadly for "loss or damage caused directly or indirectly" by such a virus. There is no dispute that the coronavirus at the heart of the COVID-19 pandemic can induce physical distress, illness, and disease.

Nor do we think it can reasonably be argued that the coronavirus did not cause the losses and expenses alleged by

the businesses. Generally, "it appears that Illinois favors the efficient-or-dominant-proximate-cause rule in the absence of contrary language in the policy."[1] *Bozek v. Erie Ins. Grp.*, 46 N.E.3d 362, 368–69 (Ill. App. Ct. 2015); *see also* 7 STEVEN PLITT ET. AL., COUCH ON INSURANCE § 101:43 (3d ed. 2021) ("Most courts define the concept [of proximate cause] relative to the 'dominant' or 'moving ' cause, even if that cause was accompanied by, or followed by, other causes of a relatively minor nature."); 5 JEFFREY E. THOMAS, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 44.03[6] (LexisNexis 2021) (noting that "most jurisdictions" apply "the most significant, or 'efficient,' cause or 'the dominant and efficient cause'" standards in commercial property insurance cases).

A risk is an efficient or dominant cause if it "sets in motion, in an unbroken causal sequence, the events that cause the ultimate loss." *Bozek*, 46 N.E.3d at 368; *accord* 7 COUCH ON INSURANCE § 101:45; *see also Denham v. La Salle-Madison Hotel Co.*, 168 F.2d 576, 580 (7th Cir. 1948) ("'The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation.'" (quoting *Aetna Ins. Co. v. Boon*, 95 U.S. 117, 130 (1877))). And "[a]lthough the issue of proximate cause is ordinarily a question of fact determined by the trier of fact, it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the

---

[1] One state court observed long ago that the Supreme Court of Illinois "has not passed on the 'efficient and predominating cause' rule." *Davis v. Sheehan*, 357 N.E.2d 690, 695 (Ill. App. Ct. 1976). As far as we can tell, that is still the case. We nevertheless believe that the Illinois high court would adopt the analysis we set out today. In any event, the businesses do not dispute "that Illinois follows the efficient or dominant proximate causation rule." Appellants' Br. at 25.

plaintiff would never be entitled to recover." *Abrams v. City of Chicago*, 811 N.E.2d 670, 674 (Ill. 2004).

Here, the novel coronavirus causing the COVID-19 pandemic led directly to the issuance of the government orders, which the complaint alleges as the cause of the losses and expenses. As Governor Pritzker declared when issuing the executive order that limited the public's activities and the businesses' operations: "I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19." Exec. Order No. 2020-10. In other words, the virus set in motion an unbroken causal chain via the government orders to the purported losses and expenses.

The complaint's attempt to decouple the government COVID-19 orders from the COVID-19 virus itself are untenable. It's likely true, as the businesses assert, that the orders were "predicated on a myriad of considerations, not just the existence of the virus." Appellant's Br. at 16–17. Public officials must weigh many factors in formulating the scope and specifics of orders that dramatically curtail society's social and commercial activities. But there can be no honest dispute that the coronavirus was *the* reason these orders were promulgated. It was, so to speak, the prime mover. The causal relationship between the novel coronavirus, the COVID-19 pandemic, the government orders, and the alleged losses and expenses "is not debatable." *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 894 (9th Cir. 2021) (rejecting a similar argument's attempt to evade a virus exclusion).

Given this reality, taking the businesses' artful pleadings at face value would allow them "to circumvent the terms and intent of the policy and its exclusions," thereby rendering

them "essentially meaningless." *Neth. Ins. Co.*, 737 F.3d at 1179. A creative complaint cannot evade the coverage limits agreed to in an insurance contract. The district court properly concluded that the novel coronavirus, in the exclusions' language, "caused" the businesses' alleged losses and expenses.[2]

The businesses also maintain that the language of the exclusions is facially ambiguous as to whether a virus must be present on an insured's premises for the exclusions to apply. Any ambiguity in an insurance policy, they remind us, must be resolved in an insured's favor.

While it is true that "ambiguities in an insurance policy will be construed against the insurer, courts will not distort the language of a policy to create an ambiguity where none exists." *Dixon Distrib. Co. v. Hanover Ins. Co.*, 641 N.E.2d 395, 399 (Ill. 1994). The relevant exclusions here are broadly worded and do not distinguish between purported losses and expenses caused by a virus that is found on an insured's premises and a virus that is not. Instead, where policy exclusions turn on whether the cause of purported loss or damage originated "away from" or "at the … premises," the policies so distinguish. *See* Doc. 1-1 at 35; Doc. 1-2 at 58 (regarding loss or damage resulting from failure of utility services). The only reasonable interpretation of the virus exclusions is that their applicability does not depend on whether a virus is actually detected on the insureds' properties.

---

[2] Because we find that the language present in both policies' virus exclusions clearly removes coverage for losses or expenses "caused" by the COVID-19 pandemic, we need not resolve whether the addition of the term "directly or indirectly" in Mashallah's exclusion—a so-called "anti-concurrent causation" clause—is contrary to Illinois law.

Like the district court, we conclude that the virus exclusions in the businesses' policies clearly preclude insurance coverage for losses and expenses allegedly caused by the COVID-19 pandemic and government orders issued to stem its tide. Accordingly, the court below correctly dismissed Counts I and II for declaratory judgment and breach of contract. Count III was also properly dismissed because, where no benefits are owed under the terms of an insurance policy, a claim of bad-faith denial under 215 ILCS 5/155 necessarily fails. *See First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 807 (7th Cir. 2002).

## C.

Having concluded that the businesses' policy-based claims were properly dismissed, we turn to their alternative pleadings. In Count V, they allege that West Bend violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead … that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Id.* It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

"A mere breach of contract" is insufficient to show a violation of the ICFA. *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 822 (7th Cir. 2018). Rather, plaintiffs must identify "some stand-alone … fraudulent act or practice" and

"show that the injury they seek to redress was proximately caused by the alleged consumer fraud." *Id.* (quotation marks omitted).

In their complaint, the businesses allege that West Bend acted deceptively and unfairly when it collected and retained full premiums from businesses affected by government COVID-19 orders even though the risks justifying those premiums went down when the orders scaled back the businesses' commercial operations. Per the businesses, West Bend "misrepresented and omitted facts" concerning premium rates, actual risk assumed, and scope of coverage with respect to business interruptions already occurring because of government COVID-19 orders.

But there are fatal chronological problems with the deception theory, which the district court well observed. The complaint asserts that the novel coronavirus leading to the COVID-19 pandemic first arose in early 2020. But the insurance policies at issue here began months earlier, in August and October 2019. West Bend could not have intended to induce the businesses to sign contracts through reliance on misrepresentations or deceptions related to a pandemic of which West Bend as yet had no knowledge.

And when the businesses renewed their policies in August and October 2020, West Bend had already denied in the spring of that year their claims for COVID-19-related coverage. The terms of the policies beginning in 2020 were identical to those beginning in 2019. Thus, at the time of renewal, West Bend had already made clear that it did not think the businesses' COVID-19-related claims were covered by the insurance policies. So, even if the policies' terms might have left open the possibility of recovering losses and expenses caused by the

novel coronavirus—and, to be clear, we do not think the terms can be plausibly read that way—West Bend's denials of the businesses' claims removed any doubt that virus-caused losses and expenses were excluded from coverage. No reasonable policyholder could have been deceived about the scope of coverage.

While the businesses allege that they "paid more premium[s] than … they otherwise would have paid had they known the truth—that [West Bend] was not assuming risk commensurate with those premiums charged"—they do not assert that they would not have purchased (or renewed) their policies if they had known about these issues. Without such an assertion, the businesses fail to state a claim that West Bend made a material omission under the ICFA. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 740 (7th Cir. 2017).

Finally, as to unfairness, there are no plausibly alleged facts in the businesses' complaint that West Bend's conduct either violated public policy or was immoral, unethical, oppressive, or unscrupulous. "As a general rule, in the absence of a statutory provision or an express or implied agreement to the contrary, an insured may not have any part of his or her premium returned once the risk attaches, even if it eventually turns out that the premium was in part unearned." 5 COUCH ON INSURANCE § 79.7 (footnotes omitted) (noting that "the insurer has, by taking upon itself the peril, become entitled to the premium"). The businesses' brief doesn't identify any Illinois public policy that West Bend purportedly transgressed. *Cf. Harris Trust & Sav. Bank v. Ill. Fair Plan Ass'n*, 386 N.E.2d 341, 345 (Ill. App. Ct. 1979) (observing the "general rule at common law" that, "if the policy is void from the beginning so that the risk never attached, the premiums must be

tendered or returned by the insurer to the insured; but if the risk attached, then the insured is not entitled to recover the premiums paid").

And since the exclusions were clear that the policies would not cover any losses or expenses caused by a virus, the businesses were free to reject West Bend's terms and look elsewhere in the insurance marketplace. *See Toulon*, 877 F.3d at 741. An insurer, however, doesn't act wrongfully by adhering to the agreement set forth in a policy. *See id.* ("[T]here is nothing oppressive or unscrupulous about giving a counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so."). In exchange for the insureds paying premiums, West Bend agreed to insure them against risks that did not include, among other things, viruses. A "policy need not provide coverage against all possible liabilities; if it provides coverage against some, the policy is not illusory." *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 841 N.E.2d 78, 86 (Ill. App. Ct. 2005), *aff'd*, 860 N.E.2d 280 (Ill. 2006).

The ICFA "was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005). A "'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it." *Id.* At bottom, the businesses think that, because of the COVID-19 pandemic, West Bend was fortuitously subjected to less risk than the parties bargained for. Whether or not true, however, the businesses have not adequately alleged that West Bend engaged in a deceptive or unfair act or practice.

D.

Last, the businesses argue that, if the insurance policies do not obligate West Bend in these circumstances to pay the claims, then West Bend has unjustly enriched itself. Like Count V, Count IV alleges that West Bend priced and charged premiums based on the risks associated with fully operational businesses. Because government orders reduced business operations and (likewise) reduced risks, the insureds contend, West Bend is obliged to rebate excessive premiums collected contrary to "equity and good conscience," since its "misconduct" in this context was "willful, wanton, and in bad faith."

The district court concluded that the unjust-enrichment theory fails because no misconduct on West Bend's part has been reasonably alleged and because a valid insurance contract governs the parties' relationships. We agree.

Unjust enrichment under Illinois law "does not constitute an independent cause of action. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, or, alternatively, it may be based on contracts which are implied in law." *Toulon*, 877 F.3d at 741.

To the extent that the unjust enrichment claim is premised on the ICFA or bad-faith denial claims, the unjust enrichment claim cannot survive the proper dismissal of those matters. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud,

resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.").

The valid insurance contracts between the businesses and West Bend are a further reason why the unjust enrichment theory fails. "A claim for unjust enrichment is 'based upon an implied contract; where there is a specific contract that governs the relationship of the parties, the doctrine has no application.'" *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (quoting *People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992)). That is, "no implied contract can exist where an express one governs because no equitable remedy"—restitution based on unjust enrichment—"can lie where a legal one"—contractual damages—"is available." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). Although the businesses assert that West Bend has breached the terms of their insurance agreements, they have not alleged that the agreements are invalid.

This last point is fatal to the businesses' suggestion that they can successfully plead unjust enrichment as an alternative theory of recovery. As we have explained, a party's option to plead inconsistent theories such as breach of contract and unjust enrichment is "limited." *Id.* "A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is not an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Id.* But what a plaintiff may not do is "include allegations of an express contract which governs the relationship of the parties" in the count for unjust enrichment. *Id.*

The complaint in this case contains just such impermissible pleading. The businesses premise their unjust enrichment theory on the validity of their insurance contracts with West Bend. "If Defendant Insurer's denials of coverage for Plaintiffs' claims for business interruption coverage are upheld," Count IV reads, "then Defendant has been unjustly enriched in the amount of excess premium for business interruption coverage it has charged and retained."

*Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221 (Ill. App. Ct. 1998), does not help the businesses. The Illinois Court of Appeals said there that, because the plaintiff's "unjust enrichment claim [was] based on tort, instead of quasi-contract, the existence of a specific contract [did] not defeat his cause of action." *Id.* at 1225. The businesses contend that this passage permits the sort of pleading found in their complaint. But the tort alleged by the *Peddinghaus* plaintiff was that the defendant fraudulently induced him to enter the specific contract in question. *Id.* Far from asserting the validity of the contract, the plaintiff was seeking its rescission. *Id.* A successful showing of fraudulent inducement invalidates a contract, *see Wilkinson v. Appleton*, 190 N.E.2d 727, 729–30 (Ill. 1963), clearing the way for an unjust enrichment claim.

The businesses, in contrast, haven't alleged that they were induced by West Bend through fraud or misrepresentation to enter (or renew) the insurance contracts. Nor are they trying to invalidate those contracts. Instead, the businesses are relying on the validity of their insurance policies to buttress their allegations of unjust enrichment. That they may not do.

Finally, to the extent that the insureds argue that a tort basis for rebate of premiums exists by virtue of West Bend's general fiduciary duty to them, the argument fails.

The businesses maintain that in Wisconsin, where West Bend is based, a mutual insurance company has a fiduciary duty to its policyholders. *See Noonan v. NW. Mut. Life. Ins. Co.*, 687 N.W.2d 254, 260 (Wis. 2004). But "[w]hatever rights a member of a mutual company has are delineated by the terms of the contract, and come from it alone." *Andrews v. Equitable Life Assurance Soc.*, 124 F.2d 788, 789 (7th Cir. 1941); *see also Lubin v. Equitable Life Assurance Soc.*, 61 N.E.2d 753, 756 (Ill. App. Ct. 1945) ("the rights and interests of policyholders in the assets of a mutual life insurance company are contractual in nature and are measured by their policies and by the statutes, charter and by-laws, if any, which comprise the terms of their contracts"). The complaint does not allege that the insurance policies oblige West Bend to issue the businesses premium rebates in these circumstances. Indeed, the policies' only mention of rebates concerns advance premiums, which the businesses do not contend are at issue here. Yet "there is nothing inconsistent in the insurer's continuing to accept premiums, on the one hand, and relying on limitations on its liability set forth in its policy on the other hand," since a "premium is charged on the basis that there may or may not be a loss, not on a certainty that for each premium received there will be a covered loss." *Harris Trust & Sav. Bank*, 386 N.E.2d at 345.

Nor have the businesses explained why the general fiduciary duty of a mutual insurance company would entitle them to rebate of premiums here. In *Penn Mutual Life Insurance Co. v. Lederer*, 252 U.S. 523 (1920), the United States Supreme Court explained the practical workings of such enterprises. It recognized that, although it is "of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policyholder," the

excess is necessary because "the redundancy in the premium furnishes the guaranty fund out of which extraordinary losses may be met." *Id.* at 525. Yet, because "[t]he percentage of the redundancy to the premium varies, from year to year, greatly, in the several fields of insurance, and likewise in the same year in the several companies in the same field," a rebate "is rarely made within the calendar year in which the premium (of which it is supposed to be the unused surplus) was paid." *Id.* at 525, 526 & n.2.

Thus, absent "a clear contractual duty on the part of a mutual insurance company to spend its surplus when a specific reserve has been achieved, … such matters are typically left to the discretion of the company's board of directors." *Babbitt Municipalities, Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178, 1188 (Ill. App. Ct. 2016). Other than a vague appeal to West Bend's status as a mutual insurance company owing them a fiduciary duty, the businesses have not alleged a legal basis to demand a rebate of premiums.

We conclude that Counts IV and V were properly dismissed.[3]

### III. Conclusion

The district court's judgment is AFFIRMED.

---

[3] The district court was correct that, as a result of the dismissal of the businesses' claims, their class motion could not go forward. *See Collins v. Vill. of Palatine*, 875 F.3d 839, 846 (7th Cir. 2017).