In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-2708

CONSOLIDATED GRAIN AND BARGE COMPANY,

*Plaintiff-Appellant*,

*v.*

INDIANA PORT COMMISSION,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:21-cv-00129-RLY-MPB — **Richard L. Young**, *Judge*.

———————————

ARGUED SEPTEMBER 13, 2023 — DECIDED JULY 10, 2024

———————————

Before FLAUM, RIPPLE, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. This appeal presents a complex contractual dispute arising out of multiple agreements between two sophisticated parties—Consolidated Grain and Barge Company, a national exporter of grain products, and the Indiana Port Commission. Consolidated agreed to build new rail tracks at the Commission's Southwind Maritime Centre. Southwind is a 742-acre industrial complex on the banks of the Ohio River in Mt. Vernon, Indiana, with railroad

access into and out of the industrial complex and the port. In exchange, Consolidated received the right to perform rail switching services for other commercial tenants at Southwind, allowing the company to recoup its initial investment through the service fees it received from the other tenants. Consolidated also did not have to pay additional fees when it needed certain rail services for its own railcars. But circumstances changed in 2021 when the Commission hired a new rail service provider to maintain the tracks and perform rail services for the port's tenants. Consolidated sued, alleging that the Commission's retention of a new switching operator breached at least two agreements between the parties. The district court dismissed the case, determining that the plain meaning of the controlling agreements defeated Consolidated's claims. We agree and affirm.

## I

### A

The Indiana General Assembly created the Indiana Port Commission to "promote the agricultural, industrial, and commercial development" of the state through the establishment and operation of public ports. Ind. Code § 9-10-1-1. Much of this is done by private parties who invest in, develop, and operate on port land leased from the Commission. See *id.* §§ 8-10-1-7(10), -10.

Consolidated Grain and Barge Company, a leading provider of grains and related processing services, is one such tenant. Consolidated started as a small provider located on the Mississippi River's banks in 1969, but it soon expanded its operations to include services such as origination, supply,

processing, storage, production, and sale of various grain and grain products.

By 1979 Consolidated's business had reached Indiana. The company's relationship with the Commission began when Consolidated became one of the first tenants at the Southwind Maritime Centre in Mt. Vernon. Southwind is owned and operated by the Commission and equipped with piers and moorings, roads, cranes, and several miles of railroad tracks, including railcar storage tracks. Consolidated uses the storage tracks to house and fill empty rail cars, thereby reducing traffic on the central tracks. In the early years of its tenancy, Consolidated used Southwind's grain elevator and related facilities.

As Consolidated's operations grew, so too did its relationship with the Commission. In the 1990s, Consolidated started to plan for business expansion into the soybean industry and chose Southwind as the home for its first and only soybean processing plant. Consolidated believed that the rail tracks surrounding Southwind would allow it to export soybean products at a rate suitable for meeting its production and distribution goals. Critical to keeping Consolidated's operation efficient is its ability to store empty rail cars on dedicated storage tracks until needed to receive a load from the company's processing plant. Exchanging railcars ready for shipment with empty railcars on the storage tracks is known as "switching."

In 1996 the parties entered into a Lease Agreement, formalizing their operating arrangements and related obligations for Consolidated's new soybean processing plant. Among other things, Consolidated pledged to invest an initial $30 million towards the construction of the plant. The

investment made sense because the Commission's enabling statute gave tenants notice that they would be on the hook for infrastructure development in exchange for rights to operate at the port. See *id.* §§ 8-10-1-7(10), 8-10-1-10.

A few years into the Lease Agreement, a dispute over access to the Southwind storage tracks arose between Consolidated and the Commission. The parties resolved the debate in a Settlement Agreement. The 2001 Settlement Agreement sought to "immediately settle[] and forever set at rest" the dispute and related lawsuit over the then-existing storage tracks. The settlement required Consolidated to fund the construction of new storage tracks, granted Consolidated a lease of the land to construct the storage tracks, and gave Consolidated use and access rights over the tracks. Finally, in the Settlement Agreement, the Commission reserved the right to select a new rail service provider if it both notified and gave Consolidated the opportunity to submit a competing bid.

The 2001 Settlement Agreement also incorporated by reference a simultaneously executed Track Use Agreement, under which the Commission agreed to subcontract the maintenance of the storage tracks as well as the performance of other full-service rail operations, including switching services, to Consolidated. Consolidated acquired and enjoyed a right to perform its own switching services by virtue of its obligation to provide those services to other tenants. But like the Settlement Agreement, the 2001 Track Use Agreement reiterated that the Commission had the right to change rail service providers as long as it gave Consolidated advance notice and an opportunity to submit a bid.

The 2001 Settlement Agreement and Track Use Agreement governed for several years. In 2006, however, the parties

reaffirmed their relationship and executed a new lease and track use agreement. These agreements mirrored their preceding counterparts in most relevant respects once again including a port tariff in the 2006 Lease, payable to the Commission or to the "terminal operator" who services the railcars—effectively a fee for the use of the tracks and similar transportation facilities. While the 2006 Lease Agreement expires in 2028, the 2006 Track Use Agreement expired in 2021.

Though the construction and use of new storage tracks was a focal point of the 2001 Settlement Agreement, by 2008 Consolidated had yet to begin construction on the new design. Indeed, by this time, the commercial activity at Southwind had become so robust that the 2001 design of the storage tracks was no longer suitable for safe and efficient operations at the Southwind port. As a final nudge to begin construction, the parties entered into a fourth contract—an Agreement to Construct New Storage Tracks—pursuant to which Consolidated and the Commission agreed to an expanded design and an alternate location for the new storage tracks. The anticipated cost of the design exceeded the amount agreed to in 2001. Consolidated agreed to honor its original pledge of a $937,800 investment (as reflected in the 2001 Settlement Agreement) and, for its part, the Commission agreed to pay any excess costs up to $374,867.

Business proceeded as usual for the next decade. Consolidated provided rail services and maintenance for the Port and its tenants while also performing switching for its own operations. But in April 2021, a few months before the 2006 Track Use Agreement was due to expire, the Commission contemplated retaining a new full-service rail operator. The Commission gave Consolidated not only the notice required by the

Track Use Agreement, but also the obligatory opportunity to submit a bid. In the end, the Commission ultimately selected Squaw Creek Southern Railroad, another rail service provider, to replace Consolidated. After announcing this change, the Commission publicly posted the new tariff (for use of the rail tracks and railcar switching services) that would go into effect for all tenants—including Consolidated—once Squaw Creek began operating at Southwind.

B

During Consolidated's tenancy at the Port, it had been performing rail switching services for the other tenants. And it had been performing its own rail switching services without paying accompanying fees. Upon learning that the Commission retained a new provider, Consolidated worried that Squaw Creek's services would be inadequate. Of course Consolidated also did not want to incur the additional cost of paying for a rail switcher, an expense the company had avoided in past years when supplying switching services to all tenants at the Southwind port.

Aiming to fend off these service expenses, Consolidated brought this suit shortly after the Commission posted the new tariff schedule. Invoking the district court's diversity jurisdiction, 28 U.S.C. § 1332, Consolidated sued the Commission for breach of contract in federal court in southern Indiana. It alleged that the Commission violated the 2001 Settlement Agreement and the 2006 Lease Agreement by hiring a new rail service provider. Consolidated also sought a declaration establishing what it saw as a right under the 2001 Settlement Agreement and 2006 Lease Agreement to continue performing its own switching services. Consolidated saw those contracts as granting it perpetual rights to perform its own

switching at no additional cost, even if the Commission hired a new rail service provider to maintain the Southwind tracks.

The Commission moved to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that Consolidated asserted rights not supplied by the parties' various contracts. The district court agreed and granted the motion.

Consolidated now appeals.

## II

### A

We review questions of contract interpretation with a fresh set of eyes independent of the district court's analysis. See *Soarus L.L.C. v. Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018). With this case coming to us as a diversity suit, the parties point to the choice-of-law provision in the applicable agreements and urge us to apply Indiana law. See *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021). We have no reason to question the parties' choice of Indiana law to resolve their contractual dispute. See *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) (holding that Indiana choice-of-law rules generally defer to contractual choice-of-law provisions).

Under Indiana law, the terms of a contract are clear unless "reasonable people could come to different conclusions" about the contract's meaning. See *Univ. of. S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). "If the language is unambiguous, we give it its plain and ordinary meaning in view of the whole contract, without substitution or addition." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018). A mere dispute over the meaning of the terms between the

parties does not mean that they are ambiguous. See *Com. Union Ins. v. Moore*, 663 N.E.2d 179, 181 (Ind. Ct. App. 1996).

B

For Consolidated this lawsuit is all about maintaining its right to perform its own switching at no cost and on its own schedule. As any business would, Consolidated wants to avoid incurring an expense for a service it previously provided for itself incident to its rail service subcontract under the 2006 Track Use Agreement.

The Commission sees two fatal flaws with Consolidated's argument. First, the Commission emphasizes that the contracts Consolidated relies on, the 2001 Settlement Agreement and 2006 Lease Agreement, do not provide a right to perform its own switching services at no cost. Second, even if the 2001 Settlement Agreement could be read to give Consolidated a right to perform its own switching, when the Commission exercised its contractual authority to choose a different rail service provider, Consolidated's switching rights were extinguished.

Resolving this dispute requires us to discern the relationship of several key provisions in the various agreements between the parties. Consolidated focuses our attention on paragraph 5 of the 2001 Settlement Agreement, arguing that it granted the company "uninterrupted" and "forever" use of and access to the New Storage Tracks even if the Commission retained a new rail service provider. So we begin our analysis there.

In relevant part, paragraph 5 states:

> The land needed for the New Storage Tracks shall be leased by the Commission to

> Consolidated for construction of the New Storage Tracks and, when completed, Consolidated's use of the New Storage Tracks shall be at a cost of one dollar ($1.00) per year for the duration of Consolidated's tenancy at the Port under the Lease Agreement. … If the Commission contracts with a provider for rail services in place of Consolidated's rail services, Consolidated's use of and access to the New Storage Tracks shall continue without interruption and in accordance with this Agreement and the Track Use Agreement …. During the time when Consolidated is the provider for rail services for the Port's tenants and other authorized rail users under the Track Use Agreement, Consolidated agrees that failure to provide reasonable access to the New Storage Tracks when capacity is available shall constitute a breach of the Storage Track Lease and shall cause forfeiture of Consolidated's use of the New Storage Tracks.

This language establishes three potential bases for the contractual right to perform switching that Consolidated now asserts. First, the 2001 Settlement Agreement grants Consolidated a lease over the land allocated for construction of the New Storage Tracks. Separately, it permits Consolidated to serve as the Port's rail service provider for a limited term. Finally, paragraph 5 states that Consolidated shall enjoy a right to "use" and "access" the New Storage Tracks that must "continue without interruption and in accordance with this Agreement and the Track Use Agreement." It is unclear to us whether the lease and the "use" and "access" rights confer on Consolidated different benefits by the contract's terms. But

we need not dwell on the point because, as we explain, the outcome of this dispute does not turn on the interpretation of either of those rights.

The 2001 Settlement Agreement also bestowed an important right on the Commission. Paragraph 9 of that agreement permitted the Commission to "seek a [new] railroad [service provider] to operate at the Port" if it "notif[ies] Consolidated that it is seeking such a railroad and give[s] Consolidated the opportunity to make a proposal for the rail operations at the Port, with the selection of a railroad subject to the discretion of the Commission."

The next pair of pertinent agreements came in 2006. The 2006 Lease Agreement reaffirmed Consolidated's rights in the original 1996 Lease, which is itself incorporated by reference in the 2001 Settlement Agreement. The 2006 Lease Agreement also granted Consolidated non-exclusive ingress and egress rights to the central tracks so the company could reach its soybean processing facility. Otherwise, the 2006 Lease Agreement did little to modify the business relationship between Consolidated and the Commission.

The 2006 Track Use Agreement, simultaneously executed with the 2006 Lease Agreement, obligated Consolidated to maintain the tracks and perform rail services for other tenants at the Port, while implicitly allowing the company to perform its own switching. Both parties agree on this point. And, like paragraph 9 of the 2001 Settlement Agreement, paragraph 14 of the 2006 Track Use Agreement gives the Commission:

> The right to seek other interested third parties
> to be the railroad to handle rail switching and,
> in such case, shall give Consolidated thirty []

days notice that the [Commission] is seeking
such a rail switching provider. Consolidated
shall have the opportunity to make a proposal
…. The selection of the rail switching service
provider shall be within the sole discretion of
the [Commission].

The 2008 New Storage Tracks Agreement also plays an important role in this dispute. Because of Southwind's growth between 2001 and 2008, the storage tracks required a new design and thus a contract between the parties establishing the terms for their construction. Hence the parties' execution of the 2008 New Storage Tracks Agreement, paragraph 4 of which states:

Title and ownership of the New Storage Tracks
is, and shall remain vested in the [Commission],
and notwithstanding paragraph 5 of the Settlement there shall be no lease of the New Storage
Tracks between the [Commission] and [Consolidated]. Provided however, the New Storage
Tracks shall be included within and subject to
the Track Use Agreement and Service Agreement set out in paragraph 7 of the Settlement, as
thereafter amended by the parties.

C

Against this summary of the pertinent agreements, we turn to how the contracts interact. Indiana law instructs us to construe together contracts relating to the same transaction, unless anything indicates to the contrary. See *Care Grp. Heart Hosp., LLC*, 93 N.E.3d at 753. So we must consider how each

contract impacts the rights established in previous agreements. See *id.*

We conclude that the 2008 New Storage Tracks Agreement unambiguously revoked all rights related to the lease of the New Storage Tracks that Consolidated previously held. The 2008 Agreement states that "[t]itle and ownership of the New Storage Tracks is, and shall remain vested in the [the Commission], and notwithstanding paragraph 5 of the Settlement there shall be no lease of the New Storage Tracks between the [Commission] and [Consolidated]." We see the "notwithstanding clause" as clear and precise: it tells us that the 2008 New Storage Tracks Agreement ended Consolidated's lease of the storage tracks, along with any rights under the lease conferred by paragraph 5 of the Settlement Agreement. When "notwithstanding" modifies a phrase that follows, it means "despite" or "in spite of" the thing that follows. See *Notwithstanding*, BLACK'S LAW DICTIONARY 1231 (10th ed. 2014). Its function in the 2008 Agreement, then, is to extinguish existing obligations in paragraph 5 of the 2001 Settlement Agreement that preexisted the 2008 Agreement related to the lease.

Consolidated contends that, even though its lease over the New Storage Tracks has ended, it retains an independent right to "use" and "access" the tracks under the terms of the 2001 Settlement Agreement. That may well be true. The 2001 Settlement is ambiguous regarding whether Consolidated's right to use and access the New Storage Tracks exists irrespective of its leasehold. On the one hand, the 2001 Settlement Agreement specifies that "Consolidated's use of the New Storage Tracks" shall be guaranteed for the duration of its "tenancy at the Port under the Lease Agreement," which suggests that Consolidated's right to use and access the tracks

might depend on its leasehold. But the 2001 Agreement also states that Consolidated's lease shall apply to "[t]he land needed for the New Storage Tracks" for their "construction," which hints that the lease may be unrelated to the actual use of the tracks once completed. Given this discrepancy—and because both parties appear to concede the point—we assume for the sake of resolving this appeal that the 2001 Settlement Agreement conferred a separate right to use and access the New Storage Tracks and that the separate right persists despite the termination of Consolidated's lease.

The assumption that Consolidated retains a right to use and access the New Storage Tracks under the 2001 Settlement Agreement does not resolve this case, however. Consolidated contends that paragraph 5 of the 2001 Settlement Agreement gave it "uninterrupted" and perpetual access to the tracks to store rail cars and to perform its own switching services. Consolidated believes that its "use and access" rights—and thus its switching rights—remain intact even after the 2008 Track Use Agreement ended Consolidated's leasehold. We cannot agree.

Taking a step back, even if we assume that Consolidated retains "use and access" rights that survive the leasehold, Consolidated has not supported its assertion that its "use and access" rights contemplate its ability to perform its own switching services even if the Commission brings on a new rail service provider. Consolidated's right to perform its own switching at no cost appears nowhere in the 2001 Settlement Agreement. Nor can the right to use and access the New Storage Tracks in paragraph 5 be interpreted to implicitly encompass such a right. The 2001 Settlement Agreement was executed in tandem with and directly cross-references the 2001

Track Use Agreement, which explicitly provided Consolidated the right to perform its own switching. That provision of the Track Use Agreement, rather than the Settlement Agreement's vague reference to continuing use and access, provided the source of Consolidated's right to perform switching.

That conclusion is fatal to Consolidated's position. The 2001 Track Use Agreement was amended and superseded by the 2006 Track Use Agreement. And the 2006 Track Use Agreement, in turn, expired in 2021. Because Consolidated has not pointed to an amendment or new contract that restores the terms of the 2006 Track Use Agreement, the only plausible conclusion is that its rights to perform its own switching expired.

Even if the 2006 Track Use Agreement had not expired, Consolidated's claim would still fail. The Commission expressly reserved the right in paragraph 9 of the 2001 Settlement Agreement and in the 2006 Track Use Agreement to seek a new rail service provider, so long as it gave Consolidated thirty days written notice and the opportunity to make a proposal. The Commission followed this procedure when hiring Squaw Creek, eliminating any claim that it breached the Agreement.

All of this leads us to conclude that Consolidated lost its rights to perform its own switching in 2021. And Consolidated has not shown us a subsequent contract that restores that right.

D

Consolidated contends that, at the very least, its rights and obligations are too ambiguous to support dismissal of its

complaint at the pleading stage. Here, too, we cannot agree. Contracts are ambiguous only when reasonable people disagree about the terms as they are written within the four corners of the contract. See *Univ. of. S. Ind. Found.*, 843 N.E.2d at 532. But, as we have explained, the only ambiguity that may exist in the contracts comes only from paragraph 5 of the 2001 Settlement Agreement, and that agreement is not the source of the rights Consolidated wishes to enforce. Consolidated does not point to any other ambiguity in the contracts—indeed, it grounded its complaint on the premise of the contracts being clear. While we agree that interpreting these contracts is a difficult task, in the end we see only one reasonable interpretation of the documents. The contracts are not ambiguous as a matter of law.

We see no way to harmonize Consolidated's position with the plain meaning of the controlling contractual provisions. And we reach this conclusion fully cognizant that we are at the pleading stage.

### III

Because the contracts are amenable to only one interpretation, our analysis ends there. We do not need to reach Consolidated's request for promissory estoppel because its position roots itself in an interpretation of the agreements, not a promise made outside of the agreements.

Under Indiana law, Consolidated could have pleaded promissory estoppel as an alternative theory of liability if it had alleged that no valid, written contract existed. See *Kacak v. Bank Calumet, N.A.*, 869 N.E.2d 1239, 1241–42 (Ind. Ct. App. 2007) (considering a claim for promissory estoppel based on a bank's promise that a check "was good," rather than a

written agreement, before withdrawing money). In this way, promissory estoppel is an equitable remedy implied by law to account for the wrongful enrichment of one party at the expense of another when it reasonably relied on the promise. See *Ind. Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. Ct. App. 2008). But Consolidated asks us to find its rights within the contracts, which is an admission that a valid contract exists. Promissory estoppel cannot be an appropriate remedy.

Indeed, the Commission's promise that Consolidated emphasizes comes from one of the contracts. Consolidated explains that the Commission promised that it could use the Port tracks without interference. But this is the heart of its interpretation of paragraph 5 of the 2001 Settlement Agreement. Nor was the Commission unjustly enriched. Its relationship proceeded as bargained for—Consolidated provided its agreed upon investment for the tracks and provided rail services until the expiration of the Track Use Agreement. Consolidated has not pointed to any interaction based entirely on a mutual understanding outside of the agreements. Promissory estoppel cannot be pled in the alternative by a party who seeks only to enforce a contractual promise. See *Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 932 (Ind. Ct. App. 2003).

Because the contracts are clear, we cannot consider extrinsic evidence of the parties' dealings or promises in any event. We appreciate that we have been invited to analyze the long-term relationship between two commercial parties that has been governed by a series of complex agreements. During their time doing business together, their interactions have likely shaped a familiar course of performance in interacting with each other. Finding no ambiguity in the contracts, we

need not consider extrinsic evidence of the parties' course of performance or otherwise. See *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995).

For these reasons, the district court correctly concluded that Consolidated did not establish a breach of contract or promissory estoppel claim. We AFFIRM.